[CORPORATIONS.]

CLARK *against* THE MAYOR, ALDERMEN, and COMMON COUNCIL OF THE CITY OF WASHINGTON.

Municipal corporations, acting within the limits of the powers conferred upon them by the Legislature, in the exercise of a special franchise granted to them, and the performance of a special duty imposed upon them, are responsible for the acts and contracts of their agents, duly appointed and authorized, within the scope of the authority of such agents, in the same manner as other corporations and private individuals are responsible on their promises express and implied.

Where, by the charter granted by Congress to the city of Washington, the corporation was empowered " to authorize the drawing of lotteries," for effecting certain improvements in the city, and upon certain terms and conditions : *Held*, that the corporation was liable to the holder of a ticket in such a lottery for a prize drawn against its number, although the managers appointed by the corporation to superintend such lottery were empowered to sell, and had sold the entire lottery to a lottery dealer for a gross sum, who was, by his agreement with them, to execute the details of the scheme as to the sale of the tickets, the drawings, and the payment of the prizes.

*It seems*, that the power granted in the charter "to authorize the drawing of lotteries," cannot be exercised so as to discharge the corporation from its liability, either by granting the lottery, or selling the privilege to others, or in any other manner ; but the lotteries to be authorized by the corporation must be drawn under its superintendence, for its own account, and on its own responsibility.

ERROR to the Circuit Court for the District of Columbia.

This was an action of assumpsit, brought by the plaintiff in error, to recover of the defendants the am unt of a prize drawn in a lottery called " the fifth class of the National Lottery." A verdict was found for the plaintiff in the Court below, subject to the opinion of the Court, on a case agreed, on which judgment was rendered for the defendants, and the cause was brought by writ of error to this Court.

By the constitution of the United States, Congress has

power to exercise exclusive legislation in all cases whatsoever over the district, which being ceded by particular States, may become the seat of the government of the Union. The District of Columbia having been ceded for that purpose, Congress passed an act, creating a municipal corporation for the city of Washington; and by the act of the 4th May, 1812, for amending the charter, gave the corporation "full power and authority to authorize the drawing of lotteries for effecting any important improvement in the city, which the ordinary funds or revenue thereof will not accomplish; *provided*, that the amount to be raised in each year shall not exceed the sum of 10,000 dollars; and *provided also*, that the object for which the money is intended to be raised, shall be first submitted to the President of the United States, and shall be approved by him." For the purpose of carrying this power into execution, ten successive resolutions were passed by the corporation, the first of which was approved by the President of the United States on the 23d of November, 1812, and the last on the 21st of May, 1821, each of them for raising 10,000 dollars by lottery, for the several objects of endowing two public school houses, on the Lancasterian system; of building a work house and penitentiary, and a town house or city-hall. On the 24th of July, 1815, the corporation passed an ordinance for carrying into effect the three first of the above resolutions, and appointed certain managers by name, viz. John Davidson, Thomas H. Gillis, Andrew Way, Jr. Moses Young, William Brent, Daniel Rapine, and *Samuel N. Smallwood*, whose duty it was made to agree on and propose a scheme or schemes of a lottery or lotteries, to raise the sum of 30,000 dollars, (clear of all expenses,) and to sell and dispose of the tickets therein to the best advantage, with the least possible delay, and diligently to attend the drawing of the said lottery or lotteries, which should be in the city of Washington; and within 60 days after the drawings of the same, respectively, (the time of each drawing not to exceed two years,) to pay and satisfy the fortunate adventurers for prizes; and, within 70 days, to pay over the balance, after deducting all necessary expenses, into the city treasury; and giving to said managers full power and authority to appoint all necessary

1827.

Clark
v.
Corporation
of
Washington.

agents, clerks, and servants, to do and perform all such acts and things as might be necessary to carry into effect the provisions of the ordinance. Another ordinance was passed on the 17th of November, 1818, for the purpose of carrying into effect the 4th, 5th, 6th, and 7th, of the aforesaid resolutions, by which (*inter alia*) the mayor was authorized to appoint seven citizens to act as managers for the purpose aforesaid, whose duty was declared to be to agree on a scheme of a lottery to raise the sum of 40,000 dollars, (clear of expenses,) and to sell the said lottery, or dispose of the tickets therein to the best advantage, with the least possible delay, and diligently to attend the drawing of the said lottery, which should be in the city of Washington: *Provided*, however, that if the said managers, or a majority of them, should sell the said lottery, the individual or individuals purchasing the same, should have the power of making a scheme for the aforesaid lottery, and within 60 days after the drawing, (the time of drawing not to exceed one year,) to pay and satisfy the fortunate adventurers for prizes; and within 70 days, to pay over the balance, after deducting all necessary expenses, into the city treasury; with the like power and authority to the managers, as in the former act, to appoint all necessary agents, clerks, and servants, &c. The mayor appointed, under the authority of the last mentioned act, seven citizens to act as managers for the purposes aforesaid, the same as those appointed by name in the former act, except that, in the last, Roger C. Weightman takes the place of Samuel N. Smallwood.

On the 25th of October, 1819, another ordinance was passed, by which the managers appointed under the ordinance of 1815, were empowered to sell and dispose of the lotteries to which that ordinance refers, or so much thereof as yet remains to be drawn, in such classes, and on such terms and conditions, as should appear to them right and expedient.

In pursuance of the ordinances of 1815 and 1819, the managers sold to David Gillespie, of New-York, a lottery called the "Fifth Class of the Grand National Lottery," for the sum of 10,000 dollars, to be paid before the commencement of the drawing thereof; and the following articles of agreement were entered into for that purpose,

"Memorandum of an agreement, made and entered into this 4th day of May, 1821, between Roger C. Weightman, John Davidson, Thomas H. Gillis, Andrew Way, jun., Moses Young, William Brent, and Daniel Rapine, as managers of the lotteries authorized by an act of the Board of Aldermen and Board of Common Council of the city of Washington, for the purposes therein mentioned, approved July 24, 1815, of the one part, and David Gillespie, of the city of New-York, in the State of New-York, of the other part: Whereas, by an act of the Board of Aldermen and Board of Common Council of the said city of Washington, approved October 25, 1819, supplementary to the act aforesaid, the said managers are authorized and empowered to sell and dispose of the said lotteries, in such classes, and on such terms and conditions, as shall appear to them right and expedient, and according to the true intent and meaning of the act afore-said; and that the said managers, for the purpose of raising the sum of 10,000 dollars, in conformity with the provisions of the said first mentioned act, and in pursuance of the power and authority in them vested by the said supplementary act, have agreed to sell and dispose of, to the said David Gillespie, a lottery, denominated the Fifth Class of the Grand National Lottery, to be drawn according to the scheme hereunto annexed; and the said David Gillespie, in consideration thereof, hereby agrees to pay to the said managers the sum of 10,000 dollars, before the commencement of the drawing the said lottery, or class, at his own proper cost, charge and expense; to pay and defray all, and all manner of costs, charges, and expenses of the said lottery, or class, excepting the expense of drawing the same, and to draw the same in the city of Washington, in the presence of the said managers, and to finish and conclude the said drawing within two years from the date hereof, and to pay all the prizes within sixty days from the completion of the said drawing. It is further understood and agreed, by and between the said parties, that the said David Gillespie is to provide, at his own cost and expense, two competent clerks, to assist in the drawing of the said lottery, or class; and to execute and deliver, before the commencement of the drawing of the said lottery, or class, and within thirty days from the date hereof, to the said managers, a bond, with such se-

1827.

Clark
v.
Corporation
of
Washington.

curity as may be approved by them, in the penal sum of 35,000 dollars, conditioned for the true, fair, and faithful drawing of the said lottery or class, and according to the said scheme; for the punctual payment of all prizes, and for conducting the said lottery or class fairly and honestly, and according to this agreement, and the true intent and meaning of the said acts of the said Board of Aldermen and Board of Common Council."

The bond with security, as required by the above agreement, was given by Gillespie on the 28th of May, 1821.

On the 22d of the same month, an ordinance of the corporation was passed, authorizing the managers to appoint a president, whose duty it should be, in addition to the duties imposed by the ordinances of 1815 and 1819, to sign all contracts with the concurrence of a majority of the managers, and to sign all the lottery tickets, in every scheme or schemes sold by them. The 2d section of the ordinance allowed each of the managers of the city lotteries 3 dollars each day he had been, or should be employed; and the 7th section enacts that this compensation, " except for the class now contracted for," should be provided for and paid out of the proceeds of lotteries thereafter contracted for.

Under this authority, Thomas H. Gillis was appointed president, who signed the following ticket, No. 2929, on which the suit was brought, and which was endorsed, " Undrawn 29th day over. D. Gillespie, per J. James." The ticket was purchased by the plaintiff, from an agent of Gillespie, at Richmond, Virginia, and drew the prize of 100,000 dollars, in the fifth class of the lottery.

The drawing of the lottery was advertised in two newspapers printed in the city of Washington; in the National Intelligencer from the 18th of May, 1821, and in the Washington City Gazette from the 17th of July, 1821, until the completion of the lottery. These advertisements exhibited the scheme agreed upon between the managers and Gillespie, and annexed to their contract, gave notice of the time when the drawing would take place, of the number of days to be employed in the drawings, and that they would be completed as soon as possible, under the superintendance of the managers, whose names were annexed. To each of these advertisements was appended an advertisement signed by Gillespie as " agent for the managers," for the sale of tickets at his " *Fortunate* office, Pennsylvania Avenue, Washington City." The lottery was drawn in pursuance of the advertisements, and the managers superintended the drawing. In its progress a postponement took place; and an advertisement appeared, purporting to be signed by three of the managers, giving notice of the postponement, and its cause Another advertisement soon afterwards followed, purporting to be signed by the President, by order of the board, giving notice when the drawing would recommence.

As soon as the scheme was agreed on, all the tickets, amounting to 50,000 in number, were delivered by the managers to Gillespie, some of them signed, and others unsigned, by the President, the latter of which it was necessary to take to him to be signed before they could be sold. Some time after the drawing commenced, the president refused to sign tickets unless an equivalent in prize tickets, either paid or taken in by Gillespie, or drawn on hand, or unless the notes of individuals which Gillespie had taken, payable to himself, for tickets sold, were deposited with them. When Gillespie's clerk and agent, Webb, presented tickets to be signed, he was obliged, at the same time, to deposit such prize tickets or promissory notes; and, on some occasions, when tickets were called for, and wanted, the managers refused to sign the same for want of such equivalent. The amount of the prize tickets so deposited with the managers was about 141,779 dollars. The managers, on such occa-

1827.

Clark
v.
Corporation
of
Washington.

1827.

Clark
v.
Corporation
of
Washington.

sions, objected to trusting Gillespie with the disposal of the tickets much beyond the penalty of his bond, and Webb, who was a witness in the cause, understood, from the conversations and transactions between the parties at the time, that this precaution arose from doubts which had been circulated respecting Gillespie's solvency.

*Jan. 26 th.*

This cause was argued by the *Attorney General* and Mr. *Webster*, for the plaintiff, and by Mr. *Jones*, for the defendants.

On the part of the plaintiff, it was insisted, that the power of authorizing the drawing of lotteries, was a franchise, which the city corporation could not sell so as to avoid their liability for the abuse of the trust and confidence reposed in them by the legislature. It was admitted, that, in general, municipal corporations are not liable to be sued on contracts made by their agents. The suit must be brought against the agents. But that proceeds on the grounds that these *quasi* corporations have no funds; but where a grant is made, conferring a special franchise, and imposing special duties, there is the same responsibility in them as in any incorporated banking or insurance company. Here the contract was with the managers, as the agents of the corporation, acting within the scope of their authority.[a] Where special duties are imposed upon corporations, which can only be performed through the instrumentality of their agents, the law will raise an implied assumpsit under the same circumstances as in dealings with private individuals. It is enough to show a ratification of the acts of the agent, by receiving the benefit of the act, or otherwise. In short, they are responsible, under these circumstances, for their promises, whether express or implied, in writing or by parol.[b] And, it was contended, that the fact of their contract

a 15 *Johns. Rep.* 1. 7 *Cranch*, 299. 2 *Taunt.* 595. 12 *Ves.* 352.

b 7 *Mass. Rep.* 169. 16 *East's Rep.* 6. 3 *Mass. Rep.* 364. 7 *Cranch*, 299. 2 *Liverm. Ag.* 198. 1 *Bro. Ch.* 469. 18 *Mass. Rep.* 372. 15 *Johns. Rep.* 1. 10 *Mass. Rep.* 397. 15 *Mass. Rep.* 125. Fowle v. Corporation of Alexandria, 11 *Wheat. Rep.* 320. 2 *Taunt.* 595. 15 *East's Rep.* 408. 3 *P. Wms.* 423. *Cowp.* 86. 4 *Taunt.* 576. in note. 2 *Vern.* 146. *Paley, Ag.* 143—145. 3 *Stark. Ev.* 1621.

being cloathed with the forms of a legislative or political act of the corporation, or the authority being conferred on their agents by such an act, could make no difference in respect to their liability. But as the principal grounds of argument on the part of the plaintiff are fully stated in the opinion of the Court, it has been deemed superfluous to enlarge upon them.

1827.

Clark
v.
Corporation
of
Washington.

On the part of the defendants, it was argued, that the documentary evidence given by the plaintiff was inadmissible, and incompetent to charge the defendants in the present action. 1st. Because, if the papers given in evidence imported any contract chargeable on the corporation through their supposed agents, the managers, or through their supposed agent Gillespie, no foundation was laid for their admission by any preliminary evidence to authenticate them as the acts either of the managers or of Gillespie, far less of the corporation; but the papers (all that are any wise essential, being taken from newspapers, or other printed papers) were left to their own internal and unvouched evidence of their authenticity, as the acts of the persons whom they purport to implicate. 2d. Because, if authenticated as the acts of Gillespie, there is nothing to connect him with the managers in the relation of principal and agent; but that relation is assumed from the mere acts of the supposed agent himself. 3d. Because, whatever privity may be inferred, as between those persons, there is nothing to connect the corporation with the supposed managers, in the relation of principal and agent. The authority of the mayor to appoint seven managers of a certain lottery described in the law which gives him that authority, is shown; seven persons are afterwards found professing to act as managers of a lottery, in the terms and description of which no reference whatever is made to any lottery authorized by the corporation; and from these premises alone are inferred, (1.) the actual appointment by the mayor of these same managers; and (2.) the identity of the lottery contemplated by the corporation law, and that promulgated in. the scheme of the managers, and their alleged agent, Gillespie. 4th. Because, setting aside all the preceding objections, the alleged agency of the managers, or of any agents, clerks, or servants, of

their appointment, purports not, from the terms of their authority as shown by the plaintiff himself, to have extended to the making of contracts for and in behalf of the corporation, or in any manner to bind the corporation as the guaranty or insurer of the due payment of prizes; far less of the solvency or punctuality of any lottery contractor or undertaker; but such agency is plainly and necessarily excluded by the nature of the official relation between them, and by the terms of the only authority for predicating the existence of any kind of agency. The authority of the managers is clearly limited to the performance of certain public duties, and to the exercise of certain ministerial functions prescribed by law to the officers or ministers of the law; the true and only relation between them and the corporation, is that which subsists between the legislative or paramount authority that enacts the law, and the ministerial functionaries who execute it; not that of principal and agent in a commercial sense. 5th. The same objection lies to the nature and extent of the alleged agency of Gillespie for the managers; which must be presumed to have been limited to the official and prescribed duties of the latter, as ministerial functionaries of the law.

No privity of contract, as between the plaintiff and the corporation, could be inferred from the evidence; but such privity was clearly and positively excluded: 1st. By the nature and objects of the power communicated to the corporation by the amended charter; a power to authorize, not to exhibit and draw lotteries, at the risk and charge of their constituents; and for important objects of public improvement, to which the ordinary revenues were inadequate; not as a source of revenue, or fiscal aggrandizement, far less as a gulf to swallow up all the subsisting sources of revenue in lottery speculations. 2d. By the terms, intent, and spirit of all the corporate acts in execution of the power; all of which strictly conform to the scope and policy of the paramount law, by which the authority was vested. 3d. By the fact that Gillespie had purchased the privilege, *in integro*, to exhibit and draw the lottery, at his own risk and charge, and for his own exclusive emolument; for which he had paid a gross sum, neither to be enlarged or

diminished by, nor in any manner dependent upon the event of the lottery. The entire scheme was his, and at his disposal; subject merely to a superintending vigilance and control of municipal police, intended to protect the public from frauds and impositions in the conduct of the lottery; but, by no means, to guaranty the payment of prizes, or, in other words, the solvency and punctuality of Gillespie. 4th. By another fact, that the plaintiff purchased his ticket of one James, the keeper of a miscellaneous lottery office in Richmond, for Gillespie, and having no sort of connexion with the corporation or its managers, nor with any lottery authorized by the one, and conducted by the other, but as a general vender of lottery tickets, who might, in the course of his trade, occasionally buy or sell tickets in this as in other lotteries; and so the contract was solely between the plaintiff and James, who sold the ticket and received the price, not as the agent of the corporation or its managers, but as the agent of Gillespie individually. The lottery ticket, on which the plaintiff founds his claim, imports, *in terminis*, no contract whatever between the corporation and the possessor; nor any assurance or invitation to the ticket-buying public to trust to the corporate funds or credit for the payment of " such prize as may be drawn to its number;" nor, indeed, the remotest allusion to any interest or concern of the corporation in the scheme. If any such contract, invitation, or allusion, be involved in the terms, it must be completely latent, and only to be developed by extrinsic facts and circumstances. All the facts and circumstances adduced to explain the relations and bearings of those terms, concur in fixing upon Gillespie the primary obligation to pay the prize, in virtue of his contract, express or implied, as the exhibiter and proprietor of the lottery, and vender of the ticket. Then, if there be any contract, express or implied, between the corporation, or the managers and vendee, to see to the payment of the prize, it must be as collateral guaranty for Gillespie. But no fact is deducible, from the evidence, which goes to fix either upon the managers, or, through their agency, upon the corporation, the relative duties and obligation of such collateral guaranty.

Vol. XII.

*[margin: 1827. Clark v. Corporation of Washington.]*

As to the managers; if they be under any obligation to see to the payment of prizes, it must be either because it was one of the official duties prescribed to them by the terms of their appointment under the law from which they derive their authority, or because they voluntarily assumed it in addition to the duties devolved on them *virtute officii.*

Then, 1st. No such duty is imposed upon them by the nature of their office and functions; 2d. If it be, it is not in the nature of an absolute obligation or duty, that makes them liable, in all events, for any failure to fulfil its end and aim, but of a relative duty, which, by the express terms of the law that creates it, exacts of them nothing but " that they will diligently and impartially exercise and perform the duties and authority vested in them." 3d. No breach of this duty, arising either from negligence or design, is imputed to them ; but, on the contrary, by the plaintiff's own showing, they exerted great care, zeal, and diligence, (if, indeed, they did not take upon themselves gratuitous labour and trouble,) in order to secure the rights and interests of adventurers in the lottery ; all that is imputed to them is, the mere failure to accomplish the end and aim of their exertions. 4th. But if the grossest breach of this duty, in act and intent, were imputed to them, they would be amenable for their official misdemeanour to the corporation only ; or, if at all responsible to third persons, it could not be as collateral guaranties of Gillespie's contract, nor for any other duty *ex contractu,* but *ex delicto,* for consequential damage, unless in possession of the fund out of which the prizes should have been paid ; and then they might have been liable, jointly or severally, according to the nature of their possession, to an action for money had and received for the use of the persons entitled to prizes. But this cannot be pretended in the present case. 5th. No voluntary assumption of any obligation upon themselves, beyond the limits of their prescribed authority and duties, can be presumed ; and any express contract, beyond those limits, is not pretended.

As to the corporation; if there be any contract in

the case, it must impose an obligation, either primary and absolute, to pay the prize, or secondary and contingent, as collateral guaranty for Gillespie. The plaintiff's declaration lays a contract of the first description only, and ties him down to the proof of such a contract, made through the agency of these managers, and in no other form; while his actual proof, and every circumstance in the case, exclude and repudiate it, by fixing upon Gillespie the primary and absolute obligation; and, indeed, equally exclude and repudiate any contract of the second description. If the managers held out any assurance or invitation to the ticket-buying public, or otherwise contracted any obligation, absolute or contingent, to see to the payment of prizes, it must have been either *virtute officii*, as one of the specific duties prescribed to them by the law of their appointment, or as one gratuitously undertaken by them, and not inherent to the nature of their office and functions; either way, it was an obligation contracted, *proprio jure*, and attaching responsibility to them personally and individually.

Then, 1st. For the due performance of the prescribed duties, inherent to the nature of their office, they are directly responsible, on their bond, to the corporation, from which it is impossible to infer such an inversion in the order of responsibility, as that the managers should have made that very corporation, to which they are themselves amenable, liable for their own transgressions of such duties. 2dly. If (as is quite clear from the plaintiff's own showing) no action lay against the managers, either because the seeing to the payment of prizes was no part of their prescribed duties, or because they " diligently and impartially exercised and performed the duties and authority vested in them," it follows, necessarily, that no action lies against the corporation. Though the converse of the proposition be utterly untenable, since they may have contracted an obligation either inherent to the nature of their office, or voluntarily superinduced, the violation of which was either an official misdemeanour, or a breach of contract; for neither of which could the corporation have been held anywise responsible. 3dly. If the corporation were chargeable, under any circam-

1827.

Clark
v.
Corporation
of
Washington.

1827.

Clark
v.
Corporation
of
Washington.
stances, or in any form of action, for the misconduct of the managers, in the course of their official or ministerial duties, it could only be *ex delicto*, or *quasi ex contractu*, in an action for consequential damages, and not in an action, like the present, purely *ex contractu*. 4thly. But no action could be conceived, to make the corporation responsible to third persons for a wrong done to itself; for a transgression by its own officers against its own authority, in the breach of a positive duty to itself, voluntarily prescribed, in the exercise of its own legislative discretion, to its own officers, and enforced by adequate sanctions of its own institution. 5thly. As an obligation not strictly imposed upon the managers, *virtute officii*, it is impossible to contend that the corporation can be responsible, in this or any other conceivable form of action, for that or any other act of its officers, without the prescribed limits and sphere of their duties and authority.

*Feb. 7th.*      Mr. Chief Justice MARSHALL delivered the opinion of the Court.

This cause depends on the liability of the corporation to pay the ticket on which the suit was instituted. In considering this question, that part of the charter which contains a grant of power on the subject of lotteries, the ordinances of the corporate body in execution of the power, and the proceedings of its agents, must be reviewed.

The charter enacts, " that the corporation shall have full power and authority" " to authorize the drawing of lotteries, for effecting any important improvement in the city, which the ordinary funds or revenue thereof will not accomplish; provided, that the amount to be raised in each year shall not exceed the sum of 10,000 dollars. And provided also, that the object for which the money is intended to be raised, shall be first submitted to the President of the United States, and shall be approved of by him."

*Nature of the power vested in the corporation.*      Some doubt has been expressed whether this power is to be exercised by drawing the lottery, on account and at the risk of the corporation, or by selling the privilege to individuals, and authorizing them to draw it on their own account. This doubt is founded on the word " authorize." Congress, we are told, has not granted the power to draw lotteries. but to " authorize" their being drawn.

We cannot admit the correctness of this criticism. We do not admit the justice of that construction, which denies to the corporation the power of causing the lottery to be drawn on its own account. A corporation aggregate can legislate within its prescribed limits, but can carry its laws into execution only by its agents. Any legislative act directing a lottery to be drawn, is literally an act " to authorize the drawing of lotteries."

The object for which the lottery may be authorized, is " any important improvement in the city." Its produce is to come in aid of the ordinary funds or revenue thereof; and " the amount to be raised in each year shall not exceed the sum of 10,000 dollars." The language of the charter is not that the sum to be brought into the treasury of the city shall not exceed the sum of 10,000 dollars, but that " the amount to be raised shall not exceed that sum." This language, it is admitted, comprehends the net proceeds of the lottery, but it comprehends all those net proceeds, and does not allow a partition of profit, so as to retain 10,000 dollars for the treasury, and reserve a residue for others. The single object, for which the lottery can be drawn, is " any important improvement in the city," not the emolument of individuals. The motive with Congress for this restriction on the amount is, not to limit the sum to come into the city treasury, but to limit the extent of gaming, which the corporation may authorize. Congress must have perceived, that to bring 10,000 dollars into the treasury, either " the amount raised must exceed that sum," or the lottery must be drawn on account of the city ; for no man will purchase a lottery from which he can make nothing.

The counsel of the plaintiff in error have remarked, and the remark is certainly entitled to attention, that, in describing the power, Congress has used no words indicating the idea, that the corporation might grant or sell lotteries. " To authorize the drawing of lotteries," is, as has been said, an appropriate term for a corporate act, instituting a lottery for the benefit of the city ; but if the granting a lottery to others, or a sale of the privilege to others, had been in the mind of Congress, it is to be presumed that some words would have been used, indicating the idea.

1827.

Clark
v.
Corporation
of
Washington.

1827.

Clark
v.
Corporation
of
Washington.

There is great weight, too, in the argument, that it is a trust, and an important trust, confided to the corporation itself, for the purpose of "effecting important improvements in the city," and ought, therefore, to be executed under the immediate authority and inspection of the corporation. It is reasonable to suppose that Congress, when granting a power to authorize gaming, would feel some solicitude respecting the fairness with which the power should be used; and would take as many precautions against its abuse, as was compatible with its beneficial exercise. Accordingly, we find a limitation on the amount to be raised, and on the object for which the lottery may be authorized. It is to be for " any important improvement in the city, which the ordinary funds or revenue thereof will not accomplish;" and is subjected to the judgment of the President of the United States. The power thus cautiously granted, is deposited with the corporation itself, without an indication that it is assignable. It is to be exercised, like other corporate powers, by the agents of the corporation, under its control. While it remains where Congress has placed it, the character of the corporation affords some security against its abuse ; some security that no other mischief will result from it, than is inseparable from the thing itself. But if the management, control, and responsibility, may be transferred to any adventurer who will purchase, all the security for fairness, which is furnished by character and responsibility, is lost.

We think, then, that the most obvious, if not the exclusive construction of the charter, is, that the lotteries to be authorized by the corporation, are to be drawn under its superintendence and on its own account.

We will next advert to the measures which have been adopted for carrying this power into execution.

Ten successive resolutions were passed, the first approved on the 23d of November, 1812, and the last on the 21st of May, 1821, each of them for raising the sum of 10,000 dollars, by lottery, for particular improvements mentioned in the resolution.

The ordinance of the 24th of July, 1815, which was passed for carrying the three first of these resolutions into effect, contemplates and authorizes lotteries to be drawn

entirely under the management, for the benefit, and on the responsibility of the corporation. Seven managers are appointed by the ordinance, and they, or a majority, are authorized to employ agents, fill up vacancies in their own body, and to do every act which may be necessary for carrying its provisions into effect.

The ordinance passed on the 17th of November, 1818, for carrying the 4th, 5th, 6th and 7th resolutions into effect, authorizes the mayor to appoint seven managers, whose duty it was to agree on a scheme, to sell the said lottery, or dispose of the tickets to the best advantage. A proviso is inserted, that, should the lottery be sold, the purchasers may make the scheme; but the ordinance enacts generally, (and the enactment makes no distinction between a sale of the lottery itself, and a disposition of the tickets,) that it shall be the duty of the managers to attend diligently to the drawing of the lottery, and to pay the fortunate adventurers for prizes drawn by them. The ordinance, however, adds the farther duty of paying over the balance, after deducting all necessary expenses, into the city treasury. From this it has been inferred, that these provisions are made for the contingency that the tickets should be disposed of for the benefit of the city, and are entirely inapplicable to the contingency of an entire sale. Certainly, in the event of an entire sale, the balance, after deducting all necessary expenses, would not be payable into the treasury, unless we suppose it to mean the balance of the sum for which the lottery might be sold. But this is the only part of the clause which is inapplicable to a lottery sold out and drawn for the benefit of the purchaser.

In October, 1819, the managers appointed under the act of 1815, were empowered to sell and dispose of the lotteries to which that act refers, or so much thereof as yet remains to be drawn, in such classes, and on such terms and conditions, as shall appear to them right and expedient. The duty of the managers to superintend the drawing, and to pay the prizes, is not changed by this act, unless the mere power to sell implies such change.

The managers sold to David Gillespie, of New-York, in pursuance of the acts of 1815 and 1819, a lottery denomi-

nated the 5th class of the Grand National Lottery, for the sum of 10,000 dollars, to be paid before the commencement of the drawing the said lottery or class; and articles of agreement, in pursuance thereof, were executed on the 14th day of May, 1821. The ticket held by the plaintiff is in this class.

On the 22d of the same month, an ordinance was passed, authorizing the managers to appoint a president, whose duty it should be, in addition to the duties imposed by the acts of 1815 and 1819, to sign all contracts, with the concurrence of a majority of the said managers, and to sign all the lottery tickets in every scheme or schemes sold by them.

This ordinance recognises the duties prescribed by the the acts of 1815 and 1819. Its 2d section allows each of the managers of the city lotteries 3 dollars for each day he has been or shall be employed; and the 7th section enacts that this compensation, " except for the class now contracted for," shall be provided for and paid out of the proceeds of lotteries hereafter contracted for.

This act is understood to recognise it as a part of the duty of the managers, to continue their superintendence of the drawing of the very class which had been sold, and which comprehended the ticket that drew the prize for which this suit is brought.

The defendant has excepted to the admissibility, as well as sufficiency of the testimony offered by the plaintiff in the Circuit Court, and the objection is made in general terms. We presume, however, that it cannot apply to the charter, or to the resolutions and ordinances of the corporation. Nor do we suppose that any exception was intended to be made to the testimony which establishes the ownership of the tickets, or to the admissibility of the deposition of Mr. Webb. The first document on which a question can arise, is the ticket itself. Is this admissible in a suit against the corporation.

In considering this question, we must inquire into the connexion between the ostensible managers and the corporation.

The persons who were held out as managers to superintend the drawing of the lottery comprehending this ticket,

were, with one exception, the same persons who were appointed in the ordinance of 1815, as managers for the lotteries established by that act. The name of R. C. Weightman, is substituted for that of S. N. Smallwood. No other change appears. It is in proof that S. N. Smallwood was elected mayor; and, as the managers have, by the ordinance, a right to fill up vacancies in their own body, their acting uniformly with R. C. Weightman, is a proof that they had chosen him to fill the vacancy made by Mr. Smallwood.

But it is contended that this lottery was drawn under the act of 1818, and there is no proof that the individuals who appeared and acted as managers, had any authority under that act.

There is undoubtedly some confusion in this part of the case, and there is not much difficulty in ascribing it to its real cause. The mayor was authorized by the ordinance of 1818, to appoint managers to carry that act into execution, and the probability is, that he appointed the persons who were in office under the appointment of the corporation. The fitness of this proceeding renders it probable; and the subsequent proceedings of the corporation itself, turn this probability almost into certainty. In a case where written evidence of appointment is not in the power of the plaintiff, if indeed it exists, circumstances must be relied on to prove the fact, should it be deemed necessary.

The act of 1821 takes no notice of any appointment under the act of 1818, and makes it the duty of the managers, created under the act of 1815, to elect a president to sign all contracts, "and to sign all the lottery tickets, in every scheme or schemes sold by the said managers." Class No. 5, was then sold by these managers. Lotteries, under seven resolutions, to raise the sum of 70,000 dollars, were either sold, or for sale, either in mass or in detail, under the acts of 1815, 1818, and 1819. The language of this ordinance appears to extend to them all; and if it does, certainly admits the authority of the managers appointed under the act of 1815, to extend to all. The 7th section of the act of 1821, which provides the fund for their compensation, expressly excepts "the class now contracted for." The contract for the 5th class was executed a few days before

1827.

Clark
v.
Corporation
of
Washington

the passage of this ordinance, and it is difficult to resist the conviction that the allusion is to this contract. These provisions in the ordinance of 1821 go far to establish the authority of these managers in this very case. The receipt of the purchase money under this very contract, is also a strong circumstance in support of the authority of those who made it. But we think the corporation has waived all exception to the authority of the managers, by producing and relying on their contract for the sale of this very lottery. That body defends itself from the claim of the plaintiff, by alleging that their managers sold this lottery. Their attorney produces the contract in Court, and insists that it exempts his clients from all liability. Can he in the same cause deny the authority of those who made it? We think the connexion between the managers and the corporation is established beyond controversy.

If the persons who made this contract, are the persons appointed under the authority of the corporation, as managers for class No. 5, no doubt exists whether the ticket has emanated from them. The ordinance of the 21st of May, 1821, authorizes them to appoint a president from their own body, whose duty it shall be " to sign all the lottery tickets in every scheme or schemes sold by the said managers." The scheme for the 5th class was annexed to the agreement between Gillespie and the managers, and has been produced in Court with it. Mr. Webb proves that the ticket 2929, on which this suit was brought, was signed by T. H. Gillis, whose name is subscribed to it; and that T. H. Gillis was at that time president of the board of managers.

Liability of the corporation for the prize.

It is then satisfactorily proved that the ticket was issued and sold under the authority of the corporation, and was consequently admissible in a suit brought against that body. The remaining inquiry is, does it bind the defendants to pay the prize it has drawn in the lottery?

Had the managers, instead of selling the whole scheme in mass, sold the tickets in the usual manner, and received the purchase money of the several tickets, instead of a sum in gross, for the use of the city, this question could not have arisen. No person would have denied the liability of the

corporation. The sole inquiry then is, whether the agreement of the 14th of May, 1821, has discharged this liability.

If the exposition of the charter in the early part of this opinion be correct, this question is answered. If the corporate body was not empowered to vest in an individual the independent right of drawing lotteries for himself, and on his own responsibility, uncontrolled by the city government, then the agreement with Gillespie can operate only as a sale of the profits for a given sum, leaving the responsibility of the corporation as if that agreement had never been made. The contract would be between the corporation and the ticket purchaser; and, although the price of the ticket was paid to Gillespie, yet the corporation had consented that he should receive it for the purpose of performing their engagements to such ticket holders as should draw prizes, and had consented to receive from him 10,000 dollars, as full compensation for that portion of it which would remain after satisfying those engagements.

If the charter did grant the power to the corporation which is now claimed, the whole transaction must be considered, in order to determine its actual character. We must inquire whether the corporation has so acted as to devest itself entirely of all connexion with, control over, and responsibility for, this lottery, and substituted the purchaser in their place.

In its origin, the lottery was a city lottery. It was to be managed by persons appointed by the city, drawn under their superintendence, and, so far as the public was informed, for the benefit, and on the responsibility of the city. Tickets were prepared under the authority of the corporation, bearing on their face the city improvements for which the lottery was to be drawn, the names of the managers appointed by the city, and the words " national lottery," and " by authority of Congress." Before these tickets were disposed of in the usual way, the managers entered into an agreement with David Gillespie, to sell him a lottery denominated the fifth class of the Grand National Lottery, to be drawn according to the scheme annexed, at the costs of the said Gillespie, except the expense of drawing the same.

The stipulations of this contract show that it was not in-

1827.

Clark
v.
Corporation
of
Washington.

tended to dissolve the connexion between the city and the lottery, and to give the absolute property in it, and control over it, to Gillespie; nor to exhibit him to the world as its owner, with whom alone the purchasers of tickets were to contract, and to whom the fortunate adventurers were to look for the payment of their prizes. He engages to draw the lottery in the city of Washington, in the presence of the managers; to finish the drawing within two years from the date of the contract; to pay all the prizes within sixty days from its completion; to provide two clerks to assist at the drawing; and to execute, within thirty days, and before the drawing should commence, a bond to the managers, with such security as they should approve, in the penal sum of 35,000 dollars, conditioned for the faithful drawing of the lottery, according to the scheme, for the punctual payment of the prizes, and for conducting the lottery fairly and honestly, according to the scheme, and according to the true intent and meaning of the acts of the aldermen and board of common council.

A bond was executed in pursuance of this agreement.

These provisions are in the spirit of a contract made to secure the city from the hazard of a continuing responsibility; a responsibility which they were induced to continue by the consideration of the 10,000 dollars paid by Gillespie. Why else stipulate that the lottery should be drawn in the city? Why that it should be completed within a limited time, and drawn in the presence of the managers appointed by the corporation? Why that the prizes should be paid? and why take a bond to the managers, conditioned, among other things, for their payment? Had the corporation felt no farther interest in the lottery, the purchaser might have been permitted to exercise his own discretion with the article he had purchased, and to appear to the world as its owner. But the nature of the case justifies the opinion that such a sale could not have been made. No purchaser could have been found who would have given 10,000 dollars for the privilege of drawing a lottery on his own account and responsibility, having no connexion with the city. The probability is strong, that the aspect which the lottery still continued to bear was a necessary part of the contract,

without which it would never have been made, and that these precautions were used to diminish the hazard of a responsibility which was unavoidably continued. We find the appearance of this responsibility carefully preserved by the corporation itself, and by its managers. In the ordinance of the 2nd of May, 1821, it is enacted, that the tickets shall be signed by the president of their board of managers, and that their managers shall receive a daily allowance for attending the drawing of the lottery. The tickets were signed in conformity with this ordinance.

The manner in which the lottery was advertised, confirms the opinion that the contract of sale was made with a view to the continuing the responsibility of the city. Exception is taken to the admission of these advertisements, and we will not affirm that their appearance in the city papers, one of which was published by a member of the corporate body, is evidence that the publication was made by authority of the managers; but the advertisements prove the fact that the lottery was ushered to the world in the form and character which those advertisements represent. It is proved that they were published in two papers in the city, in the National Intelligencer from the 18th of May, 1821, and in the Washington City Gazette from the 17th of July, 1821, until the completion of the lottery. These advertisements exhibited the scheme which was agreed on between the managers and Gillespie, which was annexed to their contract; gives notice of the time when the drawing would take place; of the number of days to be employed in the drawings, and that they would be completed as soon as possible, under the superintendence of the managers. To this advertisement the names of the managers are annexed. The lottery is drawn in pursuance of it, and the managers superintend the drawing. In its progress, a postponement takes place. An advertisement purporting to be signed by three of the managers appears, giving notice of this postponement, and of its cause. Another advertisement soon follows, purporting to be signed by the president, by order of the board, giving notice when the drawing would recommence. It does recommence under the super intendence of the managers.

It is not, we think, within the compass of human credulity, to believe that the managers did not see these advertisements, or did not believe that they would be received by the public as being accredited by their names. Not to contradict them was to sanction them. To appear in pursuance of them, and superintend the drawings of which they had given notice, was to adopt them. It is not to be believed that this concurrence of circumstances, all tending to assure the public that these advertisements were published by authority of the managers, could have been produced by accident. To sit daily superintending the drawing of a lottery, in pursuance of notice published every day under their names, verifies that publication, and must be considered as a ratification of it.

The proceedings which took place between the managers and Gillespie, after the contract, still farther corroborates the opinion that this continuing responsibility of the corporation which was held out to the public, was not a fraudulent representation for the purpose of enabling Gillespie to sell the tickets, but a representation of the fact as then understood.

It appears, from the deposition of Mr. Webb, that all the tickets, amounting to 50,000, were put into the possession of Gillespie; but these tickets were not vendible until signed by the president of the board of managers. Those unsigned could no more be used by him than if they had not been in his possession. As soon as the scheme was agreed on, three or four thousand tickets were signed, and afterwards tickets were occasionally signed, so as to make the additional number of 17,208. Why were these tickets thus withheld from him, if he had become the absolute and unconditional proprietor of them? The conduct of the managers, as disclosed in the subsequent part of Webb's deposition, will inform us. He says, that some time after the drawing of the lottery commenced, the president of the managers refused to sign tickets, unless an equivalent in prize tickets, either paid and taken in by Gillespie, or drawn on hand, or the notes of individuals which Gillespie had taken, payable to himself, for tickets sold, were deposited with them; and, accordingly, when the witness, as the

clerk and agent of Gillespie, presented tickets to be signed,
he was obliged, at the same time, to deposit such prize
tickets or promissory notes; and, on some occasions, when
tickets were called for, and wanted, the managers have re-
fused to sign the same for want of such equivalent; that the
amount of such prize tickets so deposited with the mana-
gers was about the sum of 141,779 dollars; that the mana-
gers on such occasions objected to trusting Gillespie with
the disposal of tickets much beyond the penalty of his
bond, and the witness understood, from the conversations
and transactions between the parties at the time, that this
precaution arose from doubts which had been circulated
respecting Gillespie's solvency. The whole number of
tickets actually signed was 30,960. This conduct of the
managers is explained by the supposition that they consi-
dered the city as still responsible for prizes, but is irrecon-
cilable with the idea of an entire transfer of responsibility
to Gillespie. Such entire transfer would have entitled him
to the free use of all the tickets. That the parties who
made the contract so understood it, would go far in its con-
struction, were it even in the power of the corporation to
transfer its responsibility.

We, think then, that the contract of May, 1821, can be
considered only as a sale of the profits of the lottery, and
could not, under all the circumstances of the case, affect the
responsibility of the corporation. The ticket was in fact
what it purports on its face to be, a ticket in the National
Lottery, by authority of Congress, sold under the direction
of the corporation, and signed by the person who was au-
thorized by an act of the corporate body to sign it. It as-
serts that it shall entitle the possessor to such prize as may
be drawn to its number; and this is, we think, in such a case,
the promise of the corporation, made by its authorized agent,
to pay such prize.

The judgment of the Circuit Court, then, on the verdict
found in the cause, and on the case agreed, to which that
verdict refers, ought to have been for the plaintiff. The
judgment is to be reversed, and the cause remanded to the
Circuit Court, with directions to enter judgment for the
plaintiff.