The chancellor delivered the opinion of a majority of the court; judge Layton dissenting, and chief justice Booth not sitting.
 

 Johxs, Jr.,
 
 Chancellor.
 

 The first question submitted for our consideration and decision relates to the constitutionality of the act of 1841, regarding the contract of 1839 under the protection of the tenth section of the first article of the constitution of the United States, which in the latter clause declares that no State shall pass ‘‘any law impairing the obligation of contracts.” Without intending to impugn the legislative power of the State in all matters of revenue, police and other subjects within their appropriate and legitimate action, it becomes our duty to consider the case before us as disconnected and clearly distinguishable therefrom. The defendants insist upon their rights as derived from and exercised under a written contract, executed as they contend under the express sanction of a legislative act. It is against the right or power of the legislature to vary or impair vested rights thus acquired and for a valuable consideration purchased, that they rely upon the clause in the tenth section of the constitution of the United States as their shield and defence. It has been insisted on the part of the plaintiffs, that there exists no lontrac.t, or that if there is, it recognizes by a proviso the right of legislative interference. From the course of argument adopted it rnay be necessary to inquire whether the transaction acquired the jharacter of a legal contract by the written instrument executed in Il839; and if so, what was the legal effect and design of the proviso, jf we advert to the recital of the act of the 20th of February, 3841, It is apparent that the legislature by which that act was enacted, ex-wesslv recognize the existence of contracts under which lotteries
 
 *452
 
 were then drawing, and in consequence of the existence of such contracts, declare that the drawing cannot be prohibited but may be regulated. This legislative construction of their own powers and the admitted inability to prohibit in consequence of the existence of a
 
 contract,
 
 would seem fully to establish beyond all question,
 
 that the
 
 written instrument executed in 183!) is a contract. Hence we discover, in strict accordance with this opinion of their own powers, by I the third and last section of the act of 1841, the legislature repeal all acts granting or authorizing lotteries in this State, which have not been drawn, or all not being drawn, and respecting which no con-1 tract has been made and executed for the drawing thereof.
 

 Having thus deduced from the legislative act of 1841, what ap-j pears to have been the opinion of those who made that law, con-[ cerning their own powers, we shall now proceed to consider the subject independent thereof, and give to you an opinion upon the casei judicially. We all agree that the act of 1827 authorizing the lottery! to be drawn, is neither a grant nor a contract. It is a bare del< tion of authority by which the drawing of the lottery is sanctioned,! until a certain amount or sum shall be raised for a certain purpose/ If the act had confined the authority to the simple agency of the! managers on behalf of the State, the question now presented mightf not have occurred. But in the act we find the managers are emj powered to raise the sum of $10,000, either by drawing the lotten themselves or through their agents, or by a sale of the powers grantee in the lottery act. Hence, although we regard the act as making no grant or contract with the managers, we cannot disregard thd authority granted to them to make a contract with others for a va-l luable consideration, which would be binding on the State. Whilq the authority or power delegated remained in the hands of the manal gers or agents of the legislature, it was subject to the control of th<[ legislature, either to repeal, modify or change. As a mere letter o| attorney, it could be revoked. But from the time1 when a contrae! was made under the authority conferred by the act to make a sale a new state of things took place: an authorized contract between thJ managers and .third persons, for a valuable consideration, conferred new rights and imposed new obligations. The contract having beei| made in pursuance of the powers contained in the letter of attorney and in strict conformity therewith, as also to give effect to the purl pose therein intended, must be obligatory upon the principal; nor ur der such circumstances can it be competent for the principal, evej
 
 *453
 
 should he revoke the letter of attorney, to annul or even impair the contract: its obligation rests upon him as strongly as if he had himself primarily made it and received the consideration paid. Regarding, therefore, the legislature as the principal, under whose authority the contract of 1839 was made, we do consider they had no right to violate this contract, or so revoke or modify the contract as to impair its obligation. But the act of 1841 does not assume to revoke its authority, but to modify by regulating the exercise of the powers delegated, after the same had become the property of third persons as purchasers by sale: that act recognizing the existence of certain lottery grants as under contract, and affirming that with respect to such they had no right to prohibit.
 

 The question then recurs, was the modification of the lottery grant bj act of 1841, being under contract at the time, an unconstitutional interference with the contract of 1839? The managers had by that contract for the consideration of $10,000, payable in senii-annual in-stalments of $1,000' for five years, sold and transferred to Phalen & Co., the defendants, all the power, rights and privileges to draw the lottery as authorized by the act of 1827, during the period of five years, the act having authorized the managers to make $10,000, either by drawing or sale, clear of charges and expenses. It may be proper here to remark, that while the authority existed in the [hands of the managers, it was unaffected by the lapse of time; it did [not terminate until they realised the sum of $10,000, clear of all [charges and expenses. But the purchasers by the contract of 1839 [received all the rights subject to a different limitation; they bought [the exercise of them expressly for a limited period, and agreed to ■pay the sum of $10,000 for the same or the right to enjoy the same las then existing for five years. The contract when considered in ■reference to the interests of the contracting parties and the mutuality Sf obligation, evidently secures to the vendors the payment of $10,-■000, clear of all charges and expenses in five years, and to the pur-Shasers all existing rights and privileges under the act of 1827, for land during a period of five years; and each party contracting becomes bound or subject to the obligation of the contract as the consequence of their own agreement, containing and expressing their lawn stipulations, and ascertaining clearly their respective equivalents. ■Upon such a contract and the rights vested and exercised under it lifter the lapse of two years from its execution, the legislature by the Set of 1841, declare that all persons drawing lotteries should pay to
 
 *454
 
 the school fund $10 for each drawing, and $50 to the parties entitled to the purchase money to be credited on account thereof. The simple question we have to settle in the present case is, does this addition of $10 on each drawing and variation of the time of payment of the instalments of the purchase money by requiring $50 thereof to be paid at each drawing, interfere with the contract'made with Pha-len & Co., in the year 1839, so as to impair the obligation thereof? It has been said that this was no additional charge impairing the contract, because it would come in as a charge, and the defendants would have the right to draw on to reajize the additional sum. We entertain a very different opinion: the parties by their contract agreed to no such thing. The defendants agreed to pay $10,000 for the privileges of the lottery act of 1827, with the then existing charges, If the legislature could add $10 on each drawing, they might add $1,000; it is a question of power and not of amount. So as to the imposition of $50; if they can vary the lime of payment of a part of the purchase money, why not the whole; but we consider it our duty to say the legislature had no right thus to add to or vary th contract of 1839; and that such addition and variation thereof, as it increases the amount which the defendants agreed in five years to pay for the exercise of a privilege during five years, and also varies the mode and time of payment of the sum agreed to be paid, it necea sarily has the effect of impairing the obligation of the contract. In, dependent of the constitution of the United States the act, although clearly contrary to right and incapable of being sustained, yet as the act of a sovereign power, might be valid; for it is not always tha power regards right; experience teaches that power unlimited, ofter tramples upon and disregards private right. But when we turn t the clause in the constitution of the United States, which appear there inserted as a shield and defence against all legislative actioil by a State impairing the obligation of contracts, we feel authorized to say, not only that the legislature had no right, but they had n power to regulate in the manner attempted by the act of 1841, th existing contract of 1839.
 

 In the argument of this case our attention has been drawn to th case of the
 
 Charleston Bridge Co.
 
 vs.
 
 The Warren Bridge.
 
 It doe| not appear to us analogous, or that the conclusion we have arrive^ at in reference to the questions submitted conflict with the decisio in that case. It only establishes that where the legislature had mad a grant out of one of the great powers of government for the puil
 
 *455
 
 pose of authorizing a bridge to be made with the franchise of toll, it had not exhausted the power so as to prohibit it from granting a similar power to another company for the erection of another bridge (and a free bridge.) over the same stream, although such grant might in effect prejudice or destroy the first bridge. The case before us s not the question whether the power of making other lottery acts till remains in the legislature after this was sold to defendants; nor hether such additional act, though to the injury of the defendants, would be unconstitutional; but it is whether the power still exists in be legislature by direct action, to burthen and impair the contract ade and transferred under a subsisting act. The question in the base cited was whether a contract and sale of a certain legislative ower or privilege to build a bridge was a monopoly, and restrained .he legislature from granting a similar power to others. The ques-ion here is, whether the legislature could directly add to or vary a ontract made under its authority.
 

 W. H. Rogers, Ridgely
 
 and
 
 Gilpin,
 
 for plaintiffs.
 

 Frame,
 
 (with whom was
 
 J^ M. Clayton,)
 
 for defendants.
 

 With respect to the question arising out of the suggestion that the axing power authorized the legislature thus to regulate lotteries, it sufficient for us to remark, that we do not consider the taxing pow-r as having in this case been called into action; the act of 1841 is .0 revenue bill, but a bill to regulate lotteries under contract.
 

 It only remains for me now to remark, that the proviso in the con-act does not vary the case. It was no doubt inserted to protect e purchaser in case he should be interfered with by the legitimate ction of the legislature; and the right of election excludes the pre-mption that the parties were to abandon on any interference of the gislature, especially when they reserved moreover the right to have judicial sanction to this interference.
 

 Hence we are of opinion that the act of the legislature of the State |f Delaware, passed February 20,1841, entitled “An act to regulate tteries,” so far as the same affects the contract of the defendants ade in 1839, purchasing the lights and privileges of drawing a ttery under the act of 1827, is a violation of the latter clause of e tenth section of the first article of the constitution of the United Itates, and therefore we adjudge and declare the same in relation said contract void and of no effect.