## HORNER *v.* UNITED STATES.

CERTIFICATE FROM THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 1247. Argued January 17, 1893. — Decided January 30, 1893.

Certain bonds issued by the Government of Austria, *held* to represent a " lottery or similar scheme," within the meaning of § 3894 of the Revised Statutes, as enacted by the act of September 19, 1890, c. 908, (26 Stat. 465) ; and a given circular *held* to be a " circular concerning any lottery, so-called gift, concert or other similar enterprise offering prizes dependent upon lot or chance," within the meaning of said § 3894; and the said circular *held* to constitute a " list of the drawings at any lottery or similar scheme," within the meaning of said § 3894.

What is a lottery, considered.

Cases in the United States and England, considered.

Although, by the bonds in question, Austria attempted to obtain a loan of money, she also undertook to assist her credit by an appeal to the cupidity of those who had money, and offered to each holder of a bond a chance of obtaining a prize dependent upon lot or chance, the element of certainty going hand in hand with the element of lot or chance, but the former not destroying the existence or effect of the latter.

THE case is stated in the opinion.

*Mr. Herman Aaron,* (with whom were *Mr. Alfred Taylor* and *Mr. Frederick S. Parker* on the brief,) for plaintiff in error.

*Mr. Assistant Attorney General Maury* for defendant in error.

MR. JUSTICE BLATCHFORD delivered the opinion of the court.

This is an indictment found May 16, 1892, in the Circuit Court of the United States for the Southern District of New York, founded on § 3894 of the Revised Statutes, as amended by the act of September 19, 1890, c. 908, 26 Stat. 465. The section, as so amended, reads as follows: " No letter, postal card or circular concerning any lottery, so-called gift concert,

or other similar enterprise offering prizes dependent upon lot or chance, or concerning schemes devised for the purpose of obtaining money or property under false pretences, and no list of the drawings at any lottery or similar scheme, and no lottery ticket or part thereof, and no check, draft, bill, money, postal note or money order for the purchase of any ticket, tickets or part thereof, or of any share or any chance in any such lottery or gift enterprise, shall be carried in the mail or delivered at or through any post office or branch thereof, or by any letter carrier; nor shall any newspaper, circular, pamphlet or publication of any kind containing any advertisement of any lottery or gift enterprise of any kind offering prizes dependent upon lot or chance, or containing any list of prizes awarded at the drawings of any such lottery or gift enterprise, whether said list is of any part or of all of the drawing, be carried in the mail or delivered by any postmaster or letter carrier. Any person who shall knowingly deposit or cause to be deposited, or who shall knowingly send or cause to be sent, anything to be conveyed or delivered by mail in violation of this section, or who shall knowingly cause to be delivered by mail anything herein forbidden to be carried by mail, shall be deemed guilty of a misdemeanor, and on conviction shall be punished by a fine of not more than five hundred dollars, or by imprisonment for not more than one year, or by both such fine and imprisonment for each offence. Any person violating any of the provisions of this section may be proceeded against by information or indictment and tried and punished, either in the district at which the unlawful publication was mailed, or to which it is carried by mail for delivery according to the direction thereon, or at which it is caused to be delivered by mail to the person to whom it is addressed."

Section 3894, as originally enacted in 1874, was an embodiment of § 149 of the act of June 8, 1872, c. 335, 17 Stat. 302, and read as follows: "Sec. 3894. No letter or circular concerning illegal lotteries, so-called gift concerts, or other similar enterprises, offering prizes, or concerning schemes devised and intended to deceive and defraud the public for the purpose of

obtaining money under false pretences, shall be carried in the mail. Any person who shall knowingly deposit or send anything to be conveyed by mail in violation of this section shall be punishable by a fine of not more than five hundred dollars nor less than one hundred dollars, with costs of prosecution." By the act of July 12, 1876, c. 186, § 2, 19 Stat. 90, § 3894 was amended by striking out the word "illegal."

The present indictment contains two counts. The first count alleges that Edward H. Horner, on December 29, 1891, did unlawfully and knowingly cause to be deposited in the post office at the city of New York, in the Southern District of New York, a certain circular to be conveyed and delivered by mail, "which said circular in the contents thereof, hereinafter set forth, concerned a lottery, and which was then and there addressed to Joseph Ehrman, 70 Dearborn Street, Chicago, Illinois, and was enclosed in an envelope with postage thereon prepaid and carried by mail, and which said circular contained, among other things, the following, to wit:" as is set forth in the margin, with the rest of said count.[1] The second count

[1] " Banking-house of E. H. Horner, No. 88 Wall Street.

"New York, December 27, 1890.

" 110th redemption, December 1st, 1890, at. Wien. The following 26 series were called in.

| "Serie. | No. | Fl. S. W. | Serie. | No. | Fl. S. W. | Serie. | No. | Fl. S. W. |
|---|---|---|---|---|---|---|---|---|
| " 121 | 36 | 20,000 | 1369 | 24 | 24,400 | 2666 | 63 | 400 |
| " 271 | 75 | 400 | | 46 | 400 | | 84 | 400 |
| " 280 | 22 | 1,000 | 1792 | 19 | 400 | 2988 | 2 | 400 |
| " | 65 | 400 | 1970 | 16 | 2,000 | | 10 | 400 |
| " 461 | 37 | 400 | | 69 | 400 | | 48 | 50,000 |
| " 481 | 54 | 400 | | 70 | 5,000 | | 88 | 400 |
| " | 72 | 10,000 | 3288 | 28 | 400 | 3195 | 44 | 5,000 |
| " 487 | 69 | 400 | 2412 | 53 | 400 | | 50 | 400 |
| " 493 | 6 | 400 | | 74 | 400 | 3238 | 14 | 5,400 |
| " 684 | 14 | 400 | | 82 | 400 | | 52 | 400 |
| " | 56 | 400 | 2483 | 36 | 400 | 3486 | 35 | 400 |
| " | 94 | 400 | 2526 | 72 | 400 | 3685 | 39 | 400 |
| " 815 | 70 | 400 | | 82 | 400 | | 81 | 400 |
| " | 82 | 400 | 2531 | 44 | 400 | 3969 | 4 | 400 |
| " 853 | 23 | 400 | | 91 | 1,000 | | 14 | 400 |
| " | 61 | 400 | 2666 | 3 | 400 | | 50 | 400 |
| " | 81 | 400 | | 18 | 2,000 | | | 400 |

contains the same language as the first count, except that it alleges that Horner deposited the circular in the post office.

"All other bonds contained in the above twenty-six series not specially mentioned therein are redeemed with fl. 200.

"Payment on and after March 1, 1891.

"The next report of redemption will be published in the second half of the month of January, 1891.

"Customers who have been notified by special letter of the redemption of their bonds, can cash the respective amounts at my office."

That the said words and figures of the said circular relate to and concern certain so-called bonds issued by the Empire of Austria, and state on which of said so-called bonds payments were to be made and the amount thereof, a translation of the face of one of such bonds, so called, being as follows, to wit:

"Series 921.						100 florins.						Number 60.

"*Premium Bonds.*

"One hundred florins, Austrian standard, as share of the loan of forty million florins, Austrian standard, made according to the law of November 17, 1863, (Law Journal of the Empire, No. 98,) for which the amount resulting according to the plan of redemption will be paid to the bearer by the Universal State Loan Treasury.

"Vienna, February 11, 1864.

"(Signed)						Joseph Rudde,
						"*Imperial Royal Minister Counsellor.*

"[Coat of Arms.]						Plener,
						"*Imperial Royal Minister of Justice.*

"For the board for controlling the State loans:
		"(Signed)						Collerdo Mannsfeldt.
		"(Signed)						Winterstein.

"For the Imperial Royal Universal State Loan Treasury:
		"(Signed)						Winter.
		"(Signed)						Schimkowsky."

Each of said so-called bonds having upon its face a series number and a number in the series, the amount of indebtedness which each of said so-called bonds purports to evidence being one hundred florins, the plan of drawing set forth on the back of each of said so-called bonds showing that up to April, 1874, there were to take place five drawings a year, on dates therein mentioned, to determine on which of the so-called bonds payments should be made, and the amounts of such payments, and that thereafter and until the end of the nineteenth year after the date of the issue of the so-called bonds, four drawings per year were to take place at stated dates for the same purpose, and that thereafter to and including the thirty-first year, three drawings were to take place for the same purpose at fixed dates

The defendant pleaded not guilty, was tried, convicted of the charges contained in the indictment, and sentenced, on

---

for each year, and that thereafter to and including the fifty-fifth year after the date of issue of such so-called bonds two drawings per year were to take place for the same purpose, at the end of which time all of said so-called bonds were according to the plan aforesaid to be repaid; and according to said plan the smallest amount to be paid for any of such so-called bonds selected for payment during the first year after issue was one hundred and thirty-five gulden, during the second year one hundred and forty gulden, and during the third year one hundred and forty-five gulden, and so on, increasing in amount five gulden each year until the amount should reach two hundred gulden, which amount then remained fixed as the minimum sum to be paid for any of the so-called bonds, the payment of which should be determined by the drawings aforesaid, guldens and florins being denominations of money of the same value; under the said plan other large amounts being provided to be paid on certain of the so-called bonds to be determined by the drawings, thus during the first year the following sums being according to said plan to be paid on certain so-called bonds to be determined by such drawings, to wit:

| | |
|---|---|
| On one bond............................................. | 250,000 gulden |
| On one bond............................................. | 25,000 gulden |
| On one bond............................................. | 15,000 gulden |
| On one bond............................................. | 10,000 gulden |
| On 2 bonds, each at 5000 gulden......................... | 10,000 gulden |
| On 3 bonds, each at 2000 gulden......................... | 6,000 gulden |
| On 6 bonds, each at 1000 gulden......................... | 6,000 gulden |
| On 15 bonds, each at 500 gulden......................... | 7,500 gulden |
| On 30 bonds, each at 400 gulden......................... | 12,000 gulden |

And during subsequent periods other provision being made for such large amounts, all of said so-called bonds being in the same form as said copy translation and having the same drawing and redemption plan endorsed upon them and being identical in all respects, except that the series numbers and the number thereof vary as to each so-called bond, all of the drawings heretofore referred to by which, first, are determined the series of the so-called bonds to be paid or redeemed in each year, and, second, are determined the particular bonds in the series whose holders shall be entitled to the larger sums aforesaid, the numbers of which are drawn from the wheel, being conducted in such a way as that the determination of the numbers, both for redemption and for amounts, is wholly by lot or chance, the holder of each so-called bond having an equal chance with the holder of every other so-called bond, first, in securing an early payment of his so-called bond, and, second, in securing as a so-called payment for his so-called bond the very large prizes to which reference has been hereinabove made, the result in each case, as before alleged, being dependent wholly on lot or chance.

May 24, 1892, to pay a fine of $100. A bill of exceptions was made, which states that it was admitted on the record, by the counsel for both parties, that the bond in question in the case represented 100 florins, and was one of a series of bonds aggregating 40,000,000 gulden, state loan, and that the bonds, of which the one offered in evidence was one, all represented loans made to the Empire of Austria, and were issued for the purpose of raising revenue for the government, in order to defray governmental expenses and carry on general state affairs.

After the prosecution had rested, the counsel for the defendant moved the court to direct the jury to acquit, on the following grounds: (1) The defendant is not shown by the evidence to have committed any offence against any statute law of the United States or against the common law; (2) The circular, with causing the mailing whereof the defendant is charged in this prosecution, is not a matter prohibited under section 3894 of the Revised Statutes; (3) Said circular does not concern or relate to a lottery, so-called gift concert or similar enterprise offering prizes depending upon lot or chance, or concerning schemes devised for obtaining money or property under false pretences, nor does the same concern or relate to a lottery or similar scheme or a lottery ticket or part thereof; (4) That the bond or bonds mentioned in said circular which have been proved herein are not a lottery, so-called gift concert, or similar enterprise offering prizes depending upon lot or chance, or concerning schemes devised for the purpose of obtaining money or property under false pretences, nor are the same a lottery or similar scheme or lottery ticket or part thereof; (5) That the bond or bonds mentioned in the indictment, and proved upon the trial herein, are government bonds issued by the Empire of Austria, and not within the language, meaning or purview of the statute for any violation of which the said Edward H. Horner, the defendant, has been charged herein. The counsel for the defendant also moved that the prosecution be dismissed on the same grounds severally as above enumerated. The court denied each of those motions, and the counsel for the defendant took, and was duly allowed, exceptions to such denials.

On the 14th of July, 1892, a writ of error from the United States Circuit Court of Appeals for the Second Circuit, to review the judgment of the Circuit Court, was allowed and sued out. In the Circuit Court of Appeals it was assigned for error: (1) That the matters charged in the indictment and proved upon the trial do not constitute a crime by the common law or under any statute of the United States; (2) That the circular with mailing or causing the mailing whereof the defendant is charged herein does not concern or relate to a lottery, so-called gift concert or similar enterprise offering prizes depending upon lot or chance, or concerning schemes devised for the purpose of obtaining money or property under false pretences, nor does the same relate to a lottery or similar scheme, or a lottery ticket or part thereof; (3) That the bond or bonds mentioned in said circular and proved upon the trial are government bonds issued by the Empire of Austria, and not within the language, meaning or purview of the statute. with a violation of which the said Edward H. Horner has been charged herein; (4) That the court erred in not directing the jury to acquit the defendant upon the trial hereof; (5) That said court erred in not dismissing the prosecution herein.

The Circuit Court of Appeals, on the 31st of October, 1892, pursuant to § 6 of the act of March 3, 1891, c. 517, 26 Stat. 828, certified to this court the following questions or propositions of law, concerning which it desired the instructions of this court for its proper decision: "(1) Do the bonds mentioned and described in the first and second counts of the indictment herein represent a 'lottery or similar scheme' within the meaning of section thirty-eight hundred and ninety-four of the Revised Statutes of the United States? (2) Is the circular described and set forth in the first and second counts of the indictment herein a 'circular concerning any lottery, so-called gift concert or other similar enterprise offering prizes dependent upon lot or chance' within the meaning of section thirty-eight hundred and ninety-four of the Revised Statutes of the United States? (3) Does the circular mentioned and set forth in the first and second counts of the indictment herein constitute a 'list of the drawings at any lottery or similar scheme'

within the meaning of section thirty-eight hundred and ninety-four of the Revised Statutes of the United States?"

It is contended on behalf of Horner that it is not a proper test to apply to the government bonds in question, whether or not they have an element of chance in them; that the test ought to be, whether they are a "lottery or similar scheme;" that they are not a "lottery or similar scheme;" and that all the questions certified should be answered in the negative.

It is urged that all the bonds are to be redeemed within fifty-five years from the date of their issue; that during the first year the Austrian government agrees to pay, as the minimum amount for any bond redeemed, 135 gulden; during the second year, 140 gulden; during the third year, 145 gulden; and so on, increasing 5 gulden in amount each year, until the minimum amount to be paid by the government on each bond redeemed is 200 gulden; that the primal object is only to raise money to carry on the government; that the money received by the government upon the bonds is not used as a fund out of which to pay prizes or to repay the loan; that the money for such purposes is raised by taxation and the usual means of raising revenue; that the bonds were issued in 1864, many years prior to the enactment of the original statute of the United States, which was passed in 1872; and that, as the government loan in question has for its primary object a loan, it is not transformed into a lottery because it has attached, as a subsidiary feature, an element which is like that of a lottery, in the distribution by lot or chance of certain larger premiums or awards.

But we are of opinion that the scheme in question falls within the inhibition of § 3894, as amended. The denunciation of that section is no longer against sending by mail a circular concerning an "illegal" lottery, but is against mailing a "circular concerning any lottery, so-called gift-concert, or other similar enterprise offering prizes dependent upon lot or chance."

Each "premium bond" states that the 100 florins is a "share of the loan of forty million florins," for which will be paid to the bearer "the amount resulting according to the

plan of redemption." This plan of redemption is set forth on the back of each bond, and by it each bond belongs to a distinct series, the number of which is on the face of the bond, together with the number of the bond in that series. Thus, the bond set out in the first count is No. 60 of Series 921. The bonds do not purport to be payable on a certain day, but, in order to determine what bonds are to be paid, and at what time, and what amount is to be paid on each of them respectively, it is stated on the back of the bonds, (which are dated February 11, 1864,) that until April, 1874, there are to be five drawings a year, on certain dates, to determine on which of the bonds payments are to be made and the amounts of such payments; that thereafter, and until the end of the nineteenth year from the date of the issue of the bonds, four drawings a year are to take place at stated dates, for the same purpose; that thereafter, to and including the thirty-first year, three drawings a year are to take place at certain dates, and that thereafter, to and including the fifty-fifth year after the date of the issue, two drawings a year are to take place for the same purpose, at the end of which time all of the bonds are to be paid. According to such plan, the smallest amount to be paid for any bond selected for payment during the first year after issue is 135 gulden; during the second year, 140 gulden; during the third year, 145 gulden; and so on, increasing in amount five gulden each year, until the amount reaches 200 gulden, which amount then remains fixed as the minimum sum to be paid for any bond the payment of which shall be determined by such drawings.

Under the plan, other and larger amounts are provided to be paid on certain of the bonds, to be determined by the drawings, namely, during the first year, on one bond, 250,000 gulden; on one, 25,000 gulden; on one, 15,000 gulden; on one, 10,000 gulden; on each of two bonds, 5000 gulden; on each of three, 2000 gulden; on each of six, 1000 gulden; on each of fifteen, 500 gulden; and on each of thirty, 400 gulden.

The first count further alleges that during subsequent periods other provision is made for such larger amounts; that all of the bonds are in the same form, have the same drawing

and redemption plan endorsed upon them, and are identical in all respects, except that the series number and the number thereof vary as to each bond ; and that all of the drawings, by which are determined, first, the series of the bonds to be paid or redeemed in each year, and second, the particular bonds in the series whose holders shall be entitled to the larger sums, "the numbers of which are drawn from the wheel," are conducted in such a way that the determination of the numbers, both for redemption and for the larger amounts, "is wholly by lot or chance," the holder of each bond having an equal chance with the holder of every other bond, in securing, first, an early payment of his bond, and second, as a payment for his bond the very large prizes to which reference is above made, the result in each case "being dependent wholly on lot or chance." The circular set forth in the indictment contains a list of the drawings of the scheme.

In the Century Dictionary, under the word "lottery," is the following definition : " A scheme for raising money by selling chances to share in a distribution of prizes ; more specifically, a scheme for the distribution of prizes by chance among persons purchasing tickets, the correspondingly numbered slips or lots, representing prizes or blanks, being drawn from a wheel on a day previously announced in connection with the scheme of intended prizes. In law the term *lottery* embraces all schemes for the distribution of prizes by chance, such as policy-playing, gift-exhibitions, prize-concerts, raffles at fairs, etc., and includes various forms of gambling. Most of the governments of the continent of Europe have at different periods raised money for public purposes by means of lotteries; and a small sum was raised in America during the Revolution by a lottery authorized by the Continental Congress. Both State and private lotteries have been forbidden by law in Great Britain and in nearly all of the United States, Louisiana and Kentucky being the two notable exceptions." Under that definition, the circular in question had reference to a lottery.

In Webster's Dictionary, "lottery" is defined as "A distribution of prizes by lot or chance."

In Worcester's Dictionary, it is defined as "A distribution of prizes and blanks by chance; a game of hazard, in which small sums are ventured for the chance of obtaining a larger value, either in money or in other articles;" and it is there said that during the eighteenth century the English government constantly availed itself of this means to raise money for various public works.

In the Imperial Dictionary, the word is defined thus: "Allotment or distribution of anything by fate or chance; a procedure or scheme for the distribution of prizes by lot; the drawing of lots. In general, lotteries consist of a certain number of tickets drawn at the same time, some of which entitle the holders to prizes, while the rest are blanks. This species of gaming has been resorted to at different periods by most of the European governments, as a means of raising money for public purposes."

Although the transaction in question was an attempt by Austria to obtain a loan of money to be put into her treasury, it is quite evident that she undertook to assist her credit by an appeal to the cupidity of those who had money. So she offered to every holder of a 100-florin bond, if it was redeemed during the first year, 135 florins, if during the second year, 140 florins, and so on, with an increase of 5 florins each year, until the sum should reach 200 florins; and she also offered to the holder, as part of the bond, a chance of drawing a prize varying in amount from 400 florins to 250,000 florins. Every holder of a bond has an equal chance with the holder of every other bond of drawing one of such prizes. Whoever purchases one of the bonds, purchases a chance in a lottery, or, within the language of the statute, an "enterprise offering prizes dependent upon lot or chance." The element of certainty goes hand in hand with the element of lot or chance, and the former does not destroy the existence or effect of the latter. What is called in the statute a "so-called gift concert" has in it an element of certainty and also an element of chance; and the transaction embodied in the bond in question is a "similar enterprise" to lotteries and gift concerts.

In *United States* v. *Zeisler*, 30 Fed. Rep. 499, the Circuit

Court of the United States for the Northern District of Illinois, held by Judge Blodgett, referring to certain bonds issued by the city of Vienna, in Austria, under a scheme in substance like that embodied in the bonds now before us, decided that circulars concerning the drawings thereunder were within the inhibition of § 3894. Judge Blodgett, in his opinion in the case, said pp. 500, 501: "If these drawings determined only the time when these bonds would be paid, I should say that the mere determining of that time by lot or drawing would not give them the characteristics of a lottery; but when a city or a government, in order to make an inducement for people to buy their bonds, holds out large prizes to be drawn by chance, or determined by lot in the manner in which prizes are usually determined in even an honestly conducted lottery, it seems to me it comes clearly and distinctly within the inhibiting clause of the statute under which this indictment is found. The mere reading of one of these bonds, and the drawing plan annexed to it, which is put in evidence, shows that it was the intention to stimulate the sale of the bonds by these large prizes, which were to be determined at every drawing, and which every holder of a bond had the chance of obtaining; and hence it seems to me that the purpose of the scheme was not only to determine by lot when the bonds should be paid, but also to determine certain extraordinary chances to the holders of the fortunate numbers drawn. The mere fact that these bonds are authorized by the law of a foreign country, and sanctioned by the policy of such country, does not, as it seems to me, in the least degree affect the question in this case. In *Governors of the Almshouse &c.* v. *American Art Union,* 7 N. Y. 228, a lottery was defined to be 'a scheme for the distribution of prizes by chance;' and the same definition is given in *Thomas* v. *People,* 59 Illinois, 160, and *Dunn* v. *People,* 40 Illinois, 465. The bonds in question certainly involved a lottery, within the meaning of the cases I have cited, and many more to the same effect might also be quoted. The circular sent through the mail was intended to induce persons to purchase and deal in these bonds with the hope of becoming the lucky winners of some

of the high prizes to be distributed at each drawing; and the fact that the purchasers of the bonds were, by the drawing plan, to get back their principal, and in the aggregate what is equivalent to a very small rate of interest upon that principal, does not, as it seems to me, change the character of the transaction, or relieve it from the characteristic features of a lottery; that is, that high prizes, out of all due proportion to the amount of money paid for a bond, were to be drawn for, and distributed by chance among the holders of these bonds, in the same manner as the prizes are determined in an ordinary lottery."

In *Ballock* v. *State*, 73 Maryland, 1, the Court of Appeals of Maryland held that the selling of the Austrian bonds in question was a violation of the anti-lottery law of that State. The Maryland Code, article 27, § 172, provided against the drawing of any lottery, or the selling of any lottery ticket, in the State; § 173 provided that all devices and contrivances designed to evade the provisions of § 172 should be deemed offences against it; § 174 provided a punishment for offending against any of the provisions of § 172 and § 173; § 183 provided that the preceding sections should apply to all lotteries, whether authorized by any other State, District or Territory, or by any foreign country, and that the prohibition of sale of any lottery ticket or other device in the nature thereof, should apply to lotteries drawn out of Maryland as well as those drawn within it; and § 184 provided that the courts should construe the foregoing provisions, relating to lotteries, liberally, and should adjudge all tickets, parts of tickets, certificates or any other device whatsoever, by which money or any other thing was to be paid or delivered on the happening of any event or contingency, in the nature of a lottery, to be lottery tickets. Ballock was indicted and convicted for violating those provisions, by selling Austrian government bonds substantially like the bonds in question here. The Court of Appeals said, (p. 8:) "It is true that Austrian government bonds are vendible and ought to be treated as other articles of commerce, as a rule; but when those bonds are coupled with conditions and stipulations which change their character

from simple government bonds for the payment of a certain sum of money to a species of lottery ticket which falls under the condemnation of our statutes, it must be classed as its conditions characterize it, and then it is not vendible under our law, and it does not violate constitutional provision or treaty stipulation to so hold." The court further remarked that it had been vigorously argued, that because the money ventured must all come back, with interest, so that there could be no final loss, it could not be a lottery, and added: "At some uncertain period determined by the revolution of a wheel of fortune, the purchaser of a bond does get his money repaid ; but we do not think this deprives the thing of its evil tendency, or robs it of its lottery semblance and features. The inducement for investing in such bonds is offered of getting some ' *bonus,*' *large and small*, in the future, *soon or late*, according to the chances of the wheel's disclosures. The investment may run one year or it may run thirty years, according to the decision of the wheel. It cannot be said this is not a species of gambling, and that it does not tend in any degree to promote a gambling spirit and a love of making gain through the chance of dice, cards, wheel or other method of settling a contingency. It certainly cannot be said that it is not in ' *the nature* of a lottery,' and that it has no tendency to create desire for other and more pernicious modes of gaming. Our statute does not justify a court, expressly directed to so construe the law as to prevent every possible evasion, whether designedly or accidentally-adopted, in deciding a thing is not a lottery, simply because there can be no loss, when there may be very large contingent gains, or because it lacks some element of a lottery according to some particular dictionary's definition of one, when it has all the other elements, with all the pernicious tendencies, which the State is seeking to prevent."

In *Long* v. *State*, 74 Maryland, 565, 572, it was said to be a valid exercise of power in a State to protect the morals and advance the welfare of the people by prohibiting every scheme and device bearing any semblance to lottery or gambling.

In *Cohens* v. *Virginia*, 6 Wheat. 264, 441, it was held that where an act of Congress empowered the corporation of the

city of Washington to authorize the drawing of lotteries for certain purposes it could not force the sale of the tickets in Virginia, where such sale was prohibited by law. That case is a strong authority in favor of the view that, although lottery tickets are authorized by one government, such validity cannot authorize their sale within the territory of another government which forbids such sale. That is the case now before us.

As to what have been held to be lottery tickets by the courts of the several States, reference may be made to *Commonwealth* v. *Chubb*, in the General Court of Virginia, 5 Randolph, 715; *Dunn* v. *The People*, 40 Illinois, 465, where it was held that the character of the transaction would not be changed by assuming that the ticket represented an article of merchandise intrinsically worth the amount which the holder would be obliged to pay, and that if every ticket in any ordinary lottery represented a prize of some value, yet if those prizes were of unequal values, the scheme of distribution would still remain a lottery; *Thomas* v. *The People*, 59 Illinois, 160, where a ticket was a receipt for money in payment for the delivery of a copy of an engraving, and for admission to certain concerts and lectures, for which it was sold, and money was to be distributed in presents amounting to a certain number, to the purchasers of engravings, and it was held that that was a scheme for the distribution of prizes by chance, and constituted a lottery, it being apparent that some of the purchasers would fail to receive a prize, and that even if the ticket to the concerts and lectures, and the engraving, were intrinsically worth the price paid, the scheme would still be a lottery; *Chavannah* v. *The State*, 49 Alabama, 396, where it was held that the venturing of a small sum of money for the chance of obtaining a greater sum was a lottery; *Commonwealth* v. *The Sheriff*, 10 Phila. Rep. 203, where it was said that whatever amounted to the distribution of prizes by chance was a lottery, no matter how ingeniously the object of it might be concealed; *Holoman* v. *The State*, 2 Tex. App. 610, where it was held that selling boxes of candy at fifty cents each, each box being represented to contain a prize of money or jewelry, the purchaser selecting his box in ignorance of its contents, was a

device in the nature of a lottery; *State* v. *Lumsden*, 89 Nor. Car. 572, where a like device was held to be a lottery; and *Commonwealth* v. *Wright*, 137 Mass. 250.

Cases in England are to the same effect. In *Reg.* v. *Harris*, 10 Cox's C. C. 352, it was held that a lottery in which tickets were drawn by subscribers of a shilling, which entitled them at all events to what purported to be of the value of a shilling, and also to the chance of a greater value than a shilling, was an illegal lottery within the statute. In *Sykes* v. *Beadon*, 11 Ch. D. 170, 190, there were holders of certificates, who subscribed money to be invested in funds which were to be divided amongst them by lot, and divided unequally, that is, those who got the benefit of the drawings got a bond bearing interest and a bonus, which gave them different advantages from the persons whose certificates were not drawn; and it depended upon chance who got the greater or the lesser advantage. The scheme was held to be a subscription by a number of persons to a fund for the purpose of dividing that fund among them by chance, and unequally; and Sir George Jessel, Master of the Rolls, characterized the scheme as a lottery. In *Taylor* v. *Smetten*, 11 Q. B. D. 207, packets were sold, each containing a pound of tea, at so much a packet. In each packet was a coupon entitling the purchaser to a prize, and that fact was stated publicly by the seller before the sale, but the purchasers did not know until after the sale what prizes they were entitled to, and the prizes varied in character and value. The tea was good and worth the money paid for it. It was held that the transaction constituted a lottery, within the meaning of the statute.

The only case of importance to the contrary is that of *Kohn* v. *Koehler*, 96 N. Y. 362. That was an action brought in the Supreme Court of New York by Kohn against Koehler, under § 32 of part 1, c. 20, title 8, article 4, of the Revised Statutes of New York, which provided that "any person who shall purchase any share, interest, ticket, certificate of any share or interest, or part of a ticket, or any paper or instrument purporting to be a ticket or share or interest in any ticket, or purporting to be a certificate of any share or interest in any

ticket, or in any portion of any illegal lottery, may sue for and recover double the sum of money and double the value of any goods or things in action which he may have paid or delivered in consideration of such purchase, with double costs of suit." Kohn sued to recover double the amount paid by him to Koehler for a bond issued by the authority of the government of Austria, like the bonds now in question before us, and which the Court of Appeals stated "purported on its face to be a share or interest in and to a certain illegal lottery."

The constitution of New York of 1846, in article 1, § 10, provided as follows: "Nor shall any lottery hereafter be authorized, or any sale of lottery tickets allowed, within this State." By § 22 of part 1, c. 20, title 8, article 4, of the Revised Statutes of New York, a penalty was provided against a person who should set up or propose any money to be distributed by lot or chance, to any person who should have paid or contracted to pay any valuable consideration for the chance of obtaining such money; by § 24, all contracts made or executed for the payment of any money in consideration of a chance in a distribution of money should be void; and by § 26, "every lottery, game or device of chance, in the nature of a lottery, by whatever name it may be called, other than such as have been authorized by law, shall be deemed unlawful, and a common and public nuisance."

At the special term of the Supreme Court, the defendant had a judgment in his favor, which was reversed by an order of the general term. 21 Hun, 466. The Court of Appeals reversed the order of the general term and affirmed the judgment of the special term. In its opinion the Court of Appeals said that the purpose of the Austrian government, in issuing the bonds, was to obtain money for its own use; that the provision by which, upon a certain contingency, the holder of the bond might receive an additional sum, was no doubt an inducement held out for the purpose of obtaining money on the same, but it did not constitute the main feature and the substance of the transaction between the government and the purchaser of the bond; and that it could not be held, upon any sound theory, that the privilege of obtaining by lot or

chance a larger sum than the principal, interest and premium, which the holder was sure to get in any event, imparted to the loan the character, object and accompaniments of a mere lottery scheme, in violation of the constitution and laws of the State of New York. Judge Finch dissented.

It is to be noted that the New York statute under which the action referred to was brought, was aimed against a share or interest in an "illegal" lottery. The act of Congress of June 8, 1872, now § 3894 of the Revised Statutes, as originally enacted, condemning only "illegal" lotteries, was amended by the act of September 19, 1890, so as to cover "any lottery, so-called gift concert, or other similar enterprise offering prizes dependent upon lot or chance." As the New York statute contained the word "illegal," it may be that the Court of Appeals gave force to the view that the Austrian loan was a legal lottery, from the fact that it dwelt so largely on the idea that the bonds were issued by the Austrian government, in accordance with its laws, for the purpose of obtaining a loan of money, in connection with the further facts stated by it; that like bonds had been issued by several governments of other countries, and that the bond in question was an evidence of debt and a public security of a foreign government, exposed for sale in the same manner as other securities upon which money is loaned. It by no means follows that the Court of Appeals would have made a like decision on a statute with language in it like that of § 3894.

The case of *Ex parte Shorbet*, 70 California, 632, merely followed the ruling in *Kohn* v. *Koehler, supra.*

The question whether the transaction covered by this indictment was an offence against § 3894, was sought to be raised in the case of *Horner* v. *United States*, No. 2, (143 U. S. 570,) which was before us prior to the finding of this indictment, on an appeal from an order of the Circuit Court dismissing a writ of *habeas corpus* sued out on the commitment of Horner by a commissioner of the court, to await the action of the grand jury. The point was raised here, on the appeal, that the Austrian bond scheme was not a lottery; but this court said (p. 577) that that question was properly triable by the Circuit Court, if

an indictment should be found, and that it was not proper for this court on the appeal, or for the Circuit Court on the writ of *habeas corpus*, to determine the question as to whether the scheme was a lottery. We have now considered that question, and are clearly of opinion that § 3894 applies to the transaction.

*The three questions certified must each of them be answered in the affirmative, and it is so ordered.*