PEOPLE v. WOLFF.

(Supreme Court, Appellate Division, First Department. February 5, 1897.)

LOTTERIES—CRIMINAL RESPONSIBILITY—FOREIGN GOVERNMENT BOND SALES.
Defendant was guilty of contriving and proposing a lottery, within the meaning of Pen. Code, § 325, where he carried on a scheme by which purchasers of his certificates, on full payment of a stated pecuniary consideration, became entitled to a foreign government bond of small value, and, after the first installment on the certificate, became entitled to the chance of sharing in the distribution of prizes, the winners of which were determined by lot, according to the result of drawings held under the supervision of the government issuing the bonds on which the certificates were based. Kohn v. Koehler, 96 N. Y. 362, distinguished.

Appeal from court of general sessions, New York county.

Martin Wolff was convicted of the crime of contriving and proposing a lottery, and from the judgment sentencing him to imprisonment and fine he appeals.   Affirmed.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, O'BRIEN, and INGRAHAM, JJ.

W. N. Loew, for appellant.
John D. Lindsay, for the People.

VAN BRUNT, P. J.   The defendant was indicted for contriving and proposing, and assisting in contriving and proposing, a lottery, in violation of section 325 of the Penal Code, and upon the trial was convicted and sentenced to imprisonment and fine.   From the judgment of conviction this appeal is taken, it being urged in support of the appeal that there was no evidence tending to show contriving and proposing, or assisting in contriving and proposing, a lottery.

An examination of the evidence, and an analysis thereof, show that the defendant's business consisted in a scheme, apparently gotten up by him and his partners, whereby, under the guise of

dealing in foreign lottery bonds, they had contrived a lottery of their own, whose only foundation and basis was fraud; the capital in business of the association being the positive assurance that they would never be called upon to pay anything or give anything of value for that which they received. Ostensibly the defendant claimed to be a dealer in foreign government securities, and to have on hand, for sale, certain lottery bonds of the Servian government, certain lottery bonds of the Hungarian Red Cross Association, and certain lottery bonds of the Italian Red Cross Association. The two latter, apparently, were not in any respect government bonds, nor did they pertain to any government project, but simply to lotteries established by private individuals in foreign countries. The defendant and his associates contrived a scheme by which they proposed to sell, for $80, one Servian, one Hungarian Red Cross, and one Italian Red Cross bond, payment therefor to be made by installments of $5 per month. Upon payment of the second installment the purchaser was to receive a voucher specifying the securities, by stating their series and number, such voucher certifying that, should any one or all of these securities be called in for redemption at any time before payment of the last installment, the purchaser should be entitled to all the benefits of such redemption; but, should such securities not be redeemed before payment of the last installment, then the right to deliver securities of the same description, value, and denomination, but bearing a different series and number, was reserved. The certificate further provided that, in case of the failure of the purchaser to pay any installment within 10 days after its maturity, the defendant should be at liberty to sell, without process of law, and without further notice to the purchaser, any or all of said securities at public or private sale. The certificate also provided that it should not be transferable, and it contained a notice that the original securities sold might be examined, and, upon the purchaser complying with the conditions of the certificate, would be ready for delivery at any time. It may be observed, in passing, that this notice contained in the certificate is antagonistic to the provisions of the contract; the contract providing that, upon payment of the last installment, securities of the same description, value, and denomination were to be delivered, but not necessarily those having the series and numbers mentioned in the certificate.

Upon an examination of this certificate, and a comparison of the same with the provisions of the Servian bond, it will be seen that the purchaser was not to receive all the benefits which might be derived from the possession and ownership of that bond. The holder of the certificate was to be entitled to the benefits of redemption in case one or all of the bonds should be called in for redemption; but he does not appear to have had any of the benefits which might possibly be derived from the premium drawing, which was part and parcel of the scheme of said bonds. The bonds provided for both premium and redemption drawings to be had on the same day. The bonds were to be designated by series numbers from 1 to 100, and each series by numbers from 1 to 10,000. For the

purpose of redemption drawings, the numbers 1 to 10,000 were to be put in a wheel, called "Wheel of Fortune A." For the purpose of premium drawings, the same numbers were to be put in another wheel, called "Wheel of Fortune B." And the series numbers, 1 to 100, were to be put in a third wheel, called "Wheel of Fortune C." From the wheel of fortune A there were to be drawn the numbers which should indicate the obligations winning the amounts mentioned in the redemption plan, and this is the only drawing which, under the certificate, the purchaser is entitled to participate in, or to receive the benefit of, pending the full payment of the installments. The drawing regulations then provide that, for the purpose of the premium drawing, there should be drawn out of the wheel of fortune B and out of the wheel of fortune C one number, respectively, and those two numbers should designate that obligation that would receive the capital prize. Both numbers thereupon were to be put back in the respective wheels of fortune, and the drawing was to continue as long as there were premiums mentioned in the redemption plan to be drawn. If at any of these premium drawings there should be drawn a series number and a number which had already previously drawn a premium, then the series number and the number were to be placed back in the respective wheels of fortune, because no obligation was to have a chance to have more than one premium drawn. These regulations further provide that, if a premium is drawn on an obligation which has not been redeemed, then, at the time of the payment of such premium, the premium coupon will be taken up, while the obligation itself will be returned to the owner. If, however, a redemption amount is drawn, then, upon payment of such redemption amount, the obligation is redeemed and taken up, and the premium coupon is returned to the owner.

The nature of the Italian Red Cross and the Hungarian Red Cross lotteries is not disclosed by the evidence.

It therefore appears that, although the defendant pretended to sell to the purchaser these bonds, he attempted to reserve to himself the right to the premium prizes (they being by far the largest) which might be drawn upon the bonds sold, giving to the purchaser the right only to the redemption prizes which might be drawn pending the payment of the installments. It further appears that the same series number and number were sold many times over to different purchasers; and one of the witnesses, who had been a partner of the defendant, when asked what would be done in case a series number and number were drawn which had been sold to several purchasers, replied, "In ten years it never happened that one had won anything." It further appears, from the evidence in the case, that the whole of this set of securities could be bought for six or seven dollars in cash.

It is manifest that the show of fairness with which the defendant conducted his operations, by the exhibition of the securities to the purchaser, was a mere blind and a fraud, because, having sold the same series number and number to various purchasers, he would exhibit one and the same bond to all these persons; his dealings

thus apparently being conducted with great fairness and honesty. And, in view of the fact that these same numbers were sold over and over again, it is clear that the statement of the witness that they always deposited a bond in the safe-deposit company when one was sold to any individual was absolutely untrue.

It seems to be apparent that the whole contrivance was a pretended sale to several persons of the same interest in a foreign lottery, the seller taking the risk that no number sold by him would be drawn. In fact, the defendant had on his own account contrived a lottery within a lottery, pretending that his lottery was based upon the foreign lotteries; it being determined by the chance of the drawing for redemption in the foreign lotteries whether or not he would be called upon to pay anything upon the certificates or lottery tickets issued by him. The attractive bait held out to the purchaser was the drawing of premium prizes, in which, under the terms of the certificate, he had no interest whatever, and could only get an interest by paying $80 for what he could buy in the market for $6 or $7.

The evidence of the complainant entirely bears out the conclusion which seems to be necessarily deduced from the nature of the business conducted by the defendant as delineated by himself and his witnesses. The complainant swears that the defendant sold him these tickets, for which he paid $10, the defendant stating, "All right; you win, and you will be right in;" and that he would not have to pay any more; and that, some time afterwards, the defendant told the complainant that his number did not come out, and that he had to get more money, when the complainant gave him another $5, upon which the defendant said, "That is all right now; you will play right in, and the number is bound to come out." The witness further testified:

"He did not tell me what kinds of bonds I was to receive. We did not talk about bonds at all. He said, 'Now the number has got to come out.' I was not told that I was to receive three government bonds after I had made my payments."

This evidence shows that the alleged sale of government bonds was a mere pretense, that there was never any expectation that any government bonds would be paid for or delivered, and that the certificate which was delivered as evidence of an interest of the purchaser in certain bonds was nothing more than a ticket issued by the defendant in respect to the lottery which he and his associates had contrived, whereby, if any bond of the series and number called for by the ticket should happen to be drawn in the foreign lottery for redemption, and the purchaser should ascertain the fact (which event, however, had never been known to occur), the defendant would pay to the holder of the ticket the redemption value of the bonds; it thus being dependent entirely upon chance whether the holder of the ticket would ever get anything, or the defendant be called upon to pay anything.

We think it is clear that this scheme was the contriving and proposing of a lottery, within the provisions of section 325 of the Penal Code, and that it is in no way protected by the decision of the court

of appeals in the case of Kohn v. Koehler, 96 N. Y. 362.　The scope of that case has, we think, been entirely misapprehended, and that it was not intended to decide that the sale of bonds with a lottery attachment such as was contained in the bonds then under consideration was not in contravention of section 326 of the Penal Code. It is true that there is a dictum that the sale of those bonds was not a gift enterprise, within the provisions of the Penal Code.　But, in view of the fact that the United States supreme court, in the leading case of Horner v. U. S., 147 U. S. 449, 13 Sup. Ct. 409, construing language similar to that contained in the Penal Code, held that the purchase of such a bond was the purchase of a chance in a lottery, or, in the language of the statute, "an enterprise offering prizes dependent upon lot or chance"; and of the fact that the provisions of the Penal Code were not involved in the decision of the case in the court of appeals,—it may very well be held that such schemes come within the prohibition of the Penal Code.

In the case of Kohn v. Koehler, supra, the action was brought to recover the penalties provided for by 1 Rev. St. p. 665, § 22; and it is to be observed that the only lottery, game, or device of chance, by whatever name it might be called, which the Revised Statutes declared should be deemed unlawful, and a common and public nuisance, was such as had not been authorized by law (section 26); and hence the court was construing the provisions of a statute (section 29) by which it was declared unlawful to deal in lottery tickets only when such lottery was not expressly authorized by law.　The lottery scheme contained in the Austrian bonds was expressly authorized by law, and therefore, under the Revised Statutes, was not illegal.　But, under the provisions of the Penal Code, a person who deals in tickets, chances, shares, or interest in or dependent upon the event of a lottery, to be drawn within or without this state, is guilty of a misdemeanor,—a very different case from that which was presented to the court of appeals in the Austrian Bond Case.　Under the Penal Code, dealing in any lottery tickets of any kind, nature, or description is illegal, and the person so dealing is guilty of a misdemeanor.　Under the Revised Statutes, if the lottery was authorized by law, it was not illegal to deal in its tickets; and that was the statute with which the court of appeals was concerned in Kohn v. Koehler, and not with the provisions of the Penal Code.　It necessarily follows that dealing in lottery schemes, whether authorized by a foreign government or not, comes within the prohibition of the provisions of the Penal Code.

There are no other exceptions in the case at bar which need consideration, and the judgment of conviction should be affirmed.　All concur.