## UNITED STATES v. HUGHES et al.
### No. 4783.

District Court, S. D. Texas, Houston Division.
Oct. 26, 1931.

H. M. Holden, U. S. Atty., and Albert Thomas, Asst. U. S. Atty., both of Houston, Tex., for the United States.

D. A. Simmons, Lewis Fogle, A. J. Eastham, Cole, Cole, Patterson & Kemper, and W. A. Combs, all of Houston, Tex., for defendants.

KENNERLY, District Judge.

These are motions by the defendants, J. H. Hughes and J. O. Jackson, to quash and dismiss an indictment presented against them, in this court, October 5, 1931, apparently charging (but not so specifically stating in the indictment) a violation of section 336, title 18, USCA. Such motions in effect set forth that the scheme alleged in the indictment does not constitute a violation of the laws of the United States, and that the letters alleged to have been transmitted through the United States mails do not relate to a scheme which is a violation thereof. Omitting caption and formal parts, the pertinent allegations of count 1 of the indictment are as follows:

"1. That one J. H. Hughes and one J. O. Jackson, whose first names are to the Grand Jurors unknown, from on or about the fifteenth day of April, A. D. 1929, to on or about the seventeenth day of December A. D. 1930, managed, controlled and operated in Harris County, Texas, circuit, district and division aforesaid, a certain lottery business called Southern Marriage Endowment Ass'n; that said Association was ostensibly a mutual insurance business, but in truth and in fact the Association was a lottery scheme offering prizes dependent upon lot and chance.

"2. That said J. H. Hughes and J. O. Jackson did send through the United States mails, and cause to be sent through the United States mails, letters, pamphlets, postcards and literature concerning their lottery scheme, which said scheme is about as follows:

"3. The purpose of the Association was to create an association of people for the purpose of raising and distributing amongst themselves the money so raised. The distribution of the money depended largely upon lot and chance. Any person within certain marriageable age limits and of the white race was eligible to become a member of the Association upon the payment of certain fees; that upon payment of the fees, the person so paying the fee became a member

and then the member could designate any person, male or female, white, and within marriageable age, whom the member thought was likely to be married. In some instances the marrying party would not be a member of the Association, although most of the persons designated to be married were members of the Association.

"4. That upon the marriage of the person so designated by the member, the member or person designated as beneficiary would then become eligible to receive a sum of money from the Association upon producing a certificate of the marriage of the person designated, after a given period of time. The marriage certificate had to be approved by J. H. Hughes and J. O. Jackson before payment was made to the member. The time of approving a given claim and paying same, with reference to another matured claim, involved lot and chance.

"5. After the member had produced to the Association a certificate showing the marriage of the party so designated in his so-called contract with the Association, then J. H. Hughes and J. O. Jackson would send out to all members, assessments; that is to say, the said J. H. Hughes and J. O. Jackson would mail out notices to all members telling the members that a person designated by one of the members of the Association had married, thereby maturing the so-called contract or policy of the member. Then all members were supposed to contribute to the said J. H. Hughes and J. O. Jackson the sum of $1.25 each, which in truth and in fact did not always happen. Twenty-five cents of the $1.-25 was used as a general operating expense by the said J. H. Hughes and J. O. Jackson, and $1.00 of the $1.25 would be used in paying off the claims of the members. On joining the Association each member promised to pay to the said J. H. Hughes and J. O. Jackson $1.25 to be used as aforesaid upon the maturing of each so-called contract as explained aforesaid. Upon maturity of a member's so-called contract, then the said J. H. Hughes and J. O. Jackson would try to get other persons to join the Association, thereby attempting to keep a large number of members.

"6. The amount promised to be paid to each member of the Association upon maturity of the member's so-called contract or policy was as follows:

"7. The member was promised, if the person whom he designated to be married was married within ninety days from the time the member joined the Association, nothing; if the marriage occurred after ninety days and not later than six months, the member was promised a maximum of $250.00; if the marriage occurred after six months, and not later than nine months, the member was promised a maximum of $500.00; if the marriage occurred after nine months, and not later than one year as aforesaid, the member was promised a maximum of $750.00; after one year a maximum of $1,000.00, at which date the so-called policy matured; that is to say, all assessments stopped, but certain dues were payable. The failure to pay any assessment levied by J. H. Hughes and J. O. Jackson within ten days from date of notice lapsed the member's contract and the members had no claim against J. H. Hughes and J. O. Jackson unless all assessments were paid."

It is then alleged that defendants placed in the United States mails, and caused to be carried therein, a letter concerning such scheme, the name of the addressee and the substance of such letter being given. Then follows six paragraphs purporting to give "elements of lot and chance" claimed to be involved in such scheme. These are as follows:

"(1) That the member who designated a person to marry took a grave chance on whether or not the marriage would occur, even though the designated person was the member himself, much less someone else, because it takes two to marry; that is to say, marriage in this country depends upon the free will of two persons and is not a compulsory matter on the part of one person;

"(2) The member who designates a given party to be married does not have an insurable interest in the marriage of that given party to be married, and neither do J. H. Hughes and J. O. Jackson;

"(3) The number of members to respond to the assessment of $1.25 each, upon the maturity of a so-called member's contract or policy, was highly speculative;

"(4) The number of members belonging to the Association at the time the member's so-called policy would mature was speculative;

"(5) Whether a given member's proof of claim would be received, opened and ordered paid by J. H. Hughes and J. O. Jackson ahead of another member's claim, which was received by the said J. H. Hughes and J. O. Jackson at the same time, was speculative.

"(6) The amount of money to be received by a member upon the maturity of the mem-

ber's so-called contract was highly speculative, and indefinite."

The second, third, fourth, and fifth counts in the indictment are identical with the first, except that similar mailing of different letters to different persons is alleged.

In other words, the government charges that, though *ostensibly* a mutual marriage insurance company, this company was *in truth and in fact* a lottery scheme, offering prizes dependent upon lot and chance, in violation of said section 336, and particularly the italicized portion thereof as follows: "§ 336. (Criminal Code, section 213.) Lottery, or gift enterprise circulars not mailable; place of trial. *No letter, package, postal card, or circular concerning any lottery, gift enterprise, or similar scheme offering prizes dependent in whole or in part upon lot or chance;* and no lottery ticket or part thereof, or paper, certificate, or instrument purporting to be or to represent a ticket, chance, share, or interest in or dependent upon the event of a lottery, gift enterprise, or similar scheme offering prizes, dependent in whole or in part upon lot or chance; and no check, draft, bill, money, postal note, or money order, for the purchase of any ticket or part thereof, or of any share or chance in any such lottery, gift enterprise, or scheme; and no newspaper, circular, pamphlet, or publication of any kind containing any advertisement of any lottery, gift enterprise, or scheme of any kind offering prizes dependent in whole or in part upon lot or chance, or containing any list of the prizes drawn or awarded by means of any such lottery, gift enterprise, or scheme, whether said list contains any part or all of such prizes. *shall be deposited in or carried by the mails of the United States, or be delivered by any postmaster or letter carrier.* Whoever shall knowingly deposit or cause to be deposited, or shall knowingly send or cause to be sent, anything to be conveyed or delivered by mail in violation of the provisions of this section, or shall knowingly deliver or cause to be delivered by mail anything herein forbidden to be carried by mail, shall be fined" etc.

Able briefs review many cases, some of which are Clark v. City of Washington, 12 Wheat. 40, 6 L. Ed. 544; Connecticut Mutual Life Ins. Co. v. Schaefer, 94 U. S. 457, 24 L. Ed. 251; Dillingham v. McLaughlin, 264 U. S. 373, 44 S. Ct. 362, 68 L. Ed. 747; France v. U. S., 164 U. S. 676, 17 S. Ct. 219, 41 L. Ed. 595; Horner v. U. S., 147 U. S. 449, 13 S. Ct. 409, 37 L. Ed. 237; Klein v. New York Life Ins. Co., 104 U. S. 88, 26 L. Ed. 662;

New York Life Ins. Co. v. Statham, 93 U. S. 30, 23 L. Ed. 791; United States v. Stever, 222 U. S. 167, 32 S. Ct. 51, 56 L. Ed. 145; Post Pub. Co. v. Murray (C. C. A.) 230 F. 773, certiorari denied 241 U. S. 675, 36 S. Ct. 725, 60 L. Ed. 1232; United States v. Bailey (C. C.) 47 F. 117; United States v. Fulkerson et al. (D. C.) 74 F. 619; United States v. Fulkerson et al. (D. C.) 74 F. 631; United States v. Irvine et al. (D. C.) 156 F. 376; United States v. Politzer (D. C.) 59 F. 273, 275; 17 Ruling Case Law, 1209 and 1222; 19 Ruling Case Law, 1180 and 1181; Bishop, Statutory Crimes (2d Ed.) §§ 119, 193, 194, 218, 220, 227; Century Dictionary and Cyclopedia on Lot and Lottery; 3 Words and Phrases, Second Series, p. 1222; 6 Words and Phrases, First Series, p. 5612. But I find no reported case directly in point.

I entertain no doubt that the oldest and most conservative insurance company in the nation° can be so operated as to violate this statute. Suppose, for instance, a life insurance company should descend from the high pinnacle of the protection of the families, creditors (and others having an insurable interest) of deceased persons, and use, and/or permit individuals to use, its assets and organization for gambling purposes, by there being issued to such individuals policies, certificates, tickets, or other forms of obligations, agreeing to pay (and paying) to such individuals, sums of money upon the death of a person or persons (few or many) designated by such individuals, but with whom such individuals have no ties of kinship or friendship, no financial or other interest, no insurable, but only a gambling, interest. Clearly, this would be a scheme denounced by section 336. This would be equally true if a fire insurance company should turn its fire insurance business into a gambling enterprise, by agreeing to pay individuals sums of money upon the destruction by fire of houses, etc., designated by them, to which such individuals have no interest, claim, or title whatsoever. This is substantially what the government charges in this indictment.

Horner v. United States, 147 U. S. 454, 13 S. Ct. 409, 413, 37 L. Ed. 237, supra, was an appeal from the conviction of Horner for violation of this same section (then section 3894, Revised Statutes). The scheme involved was the offering for sale of bonds of the Austrian government, the date and amount of payment of which were to be determined by lot, and there being offered to each holder of a bond a chance at drawing a prize. This intermingling of lawful busi-

ness and gambling is referred to by the court in the following language: "Whoever purchases one of the bonds purchases a chance in a lottery, or, within the language of the statute, an 'enterprise offering prizes dependent upon lot or chance.' The element of certainty goes hand in hand with the element of lot or chance, and the former does not destroy the existence or effect of the latter. What is called in the statute a 'so-called "gift concert"' has in it an element of certainty and also an element of chance, and the transaction embodied in the bond in question is a 'similar enterprise' to lotteries and gift concerts."

Ballock v. State, 73 Md. 1, 20 A. 184, 185, 8 L. R. A. 671, 25 Am. St. Rep. 559, was a prosecution against Ballock under a Maryland statute for selling similar Austrian bonds, and the court uses this language: "It cannot be said this is not a species of gambling, and that it does not tend in any degree to promote a gambling spirit and a mode of making gain through the chance of dice, cards, wheel, or other method of settling a contingency. It certainly cannot be said that it is not in the 'nature of a lottery,' and that it has no tendency to create desire for other and more pernicious modes of gaming. Our statute does not justify a court, expressly directed to so construe the law as to prevent every possible evasion, whether designedly or accidentally adopted, in deciding a thing is not a lottery simply because there can be no loss, when there may be very large contingent gains; or because it lacks some element of a lottery *according to some particular dictionary's definition of one, when it has all the other elements, with all the pernicious tendencies, which the state is seeking to prevent.* Striking at the root of the evil, and to prevent all its possible mischiefs, the statute lays down a different rule from that applied to the construction of other criminal statutes, which is a rule of strict construction. Instead of that rule, the law says this statute is to be construed liberally, in order to prevent the introduction and use of anything in the nature of a lottery, for the making of money or securing property."

While I am not unmindful that the Maryland court in this case liberally construed the Maryland statute in question, and that I must strictly construe section 336, I think the language used has peculiar application here.

The line of demarcation between legitimate insurance (and marriage insurance seems to be legitimate insurance), and a gam-

bling scheme such as is referred to above, may not always be clear; but I think this indictment, taken as a whole, sufficiently sets forth a violation of section 336, although indisputably it does also set forth acts which are not a violation of such section.

Defendants insist that the indictment must allege a consideration, a prize, and the awarding of the prize by lot or chance. The indictment alleges sums of money paid to defendants by the beneficiaries. This is I think a sufficient allegation of consideration. The allegations as to money paid or to be paid beneficiaries meet the requirement as to a prize. If the beneficiary has no insurable interest in the person designated as one who may be married, the transaction, as stated, may become a gambling transaction, and the element of chance set forth in the indictment is I think sufficient.

An order will enter, overruling the motions to quash and dismiss.